Filed 6/23/16  In re S.Y. CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| In re S.Y. et al., Persons Coming Under the Juvenile Court Law. | B267580 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>            Plaintiff and Respondent,<br><br>      v.<br><br>B.Y.,<br><br>            Defendant and Appellant. | (Los Angeles County Super. Ct. No. CK93485) |

APPEAL from an order of the Superior Court of Los Angeles County.  Timothy Saito, Judge.  Affirmed in part, dismissed in part.

John L. Dodd, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, R. Keith Davis, Acting Assistant County Counsel, and Jessica S. Mitchell, Deputy County Counsel, for Plaintiff and Respondent.

Roni Keller, under appointment by the Court of Appeal, for Respondents T.Y. and S.Y.

* * * * * *

B.Y. (father) appeals from the jurisdiction and disposition orders entered June 30, 2015. Father contends the juvenile court erred in asserting dependency jurisdiction, in removing his two minor sons pursuant to Welfare and Institutions Code section 360, subdivision (c)[1], and in improperly delegating authority to the boys' therapist as to visitation. During the pendency of this appeal, the juvenile court terminated dependency jurisdiction and issued an order granting sole physical and legal custody to G.L. (mother), with no visitation for father. We conclude father's appeal as to the visitation order is moot and therefore dismiss that portion of the appeal. As to father's remaining arguments, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Father and mother were never married, but lived together and had two sons, T.Y. and S.Y. In the spring of 2015, T.Y. was 15 years old, and S.Y. was 11.

On March 5, 2015, the family came to the attention of the Los Angeles County Department of Children and Family Services (Department) based on a report from mother that she feared father had intentionally killed the family dog in front of the two boys. The family had a prior history with the Department, including a 2012 case in which T.Y. and S.Y. were detained and placed with the maternal grandmother due to domestic violence between father and mother. That case terminated with the court granting physical custody to mother, and joint legal custody of the boys to mother and father.

The Department social worker visited the family home on March 10, 2015, and spoke with mother and both boys. Mother explained that her older son, T.Y., had called her at work a few days before and told her the dog was dead. She suspected father had killed it. Mother said father visited the home frequently but did not live there because he had previously been ordered out of the home by the court. S.Y., who needed to be reassured by the social worker he was not in any trouble, only spoke with the social worker briefly, saying he did not see or hear anything at the time the dog was killed. His

_____

[1] All undesignated section references are to the Welfare and Institutions Code.

older brother, T.Y., seemed agitated and did not want to speak with the social worker, but said that he already told the police that father had killed the dog. T.Y. also told the social worker that father did live with them.

On April 10, 2015, the social worker made an unannounced visit to the home and father answered the door. Father admitted he lived there and invited the social worker in. When the social worker told father the juvenile court had ordered him to move out of the home in 2013, father responded by saying he believed he was allowed to move back in when that case was terminated. Father admitted he killed the dog, but claimed to have done so accidentally and that neither of the boys had been present. The social worker asked father why he had lied to the police about how the dog died and father said he did not want to go to jail.

The social worker interviewed mother again and asked why she had lied about father living in the home. Mother said that after the last dependency case had been terminated, father gradually moved himself back into the home. Mother said she tried to make him leave, but he refused. Mother changed the locks to the door several times, but father was "somehow" always able to get a duplicate key. Mother expressed fear of father and worried about the safety of the children, saying father constantly "picks fights." Mother asked the social worker to help her with getting father to leave the home.

The social worker spoke with father and he agreed to collect some belongings and leave the home. The social worker then went to the hardware store and helped T.Y. change the lock to the front door.

On April 13, 2015, father went to S.Y.'s school. Mother believed he attempted to take S.Y. from the school, but was unable to do so.

On April 16, 2015, mother and the two boys participated in a Child and Family Team engagement meeting with the Department. Mother reported that since their last conversation, S.Y. had revealed that father had been hitting him the last several months. S.Y. said he had not told her about it before because father had threatened to hurt him and kill the whole family if he said anything about it. Mother confirmed she had seen several bruises on S.Y. over the last few months and had asked him about them, but he claimed

3

he had fallen and gotten injured at school. Mother also reported that S.Y. had disclosed he saw what happened to their dog and expressed fear of father.

The social worker re-interviewed S.Y. in private and asked him if he knew anything about how his dog died. S.Y. appeared nervous and anxious. S.Y. said his father threatened to hurt them if anyone told the police or the Department what had really happened to the dog. S.Y. said he had been watching videos in his room, when he saw father go out onto the balcony where the dog was. He heard the dog crying loudly and saw his father hitting the dog repeatedly with a metal pole. There was blood pooling around the dog. S.Y. ran to T.Y.'s room to tell him what was happening. Father eventually picked up the dog and took it somewhere and washed away the blood on the balcony.

S.Y. expressed fear of father and confirmed to the social worker that father had been hitting him over the last few months, usually causing bruises. S.Y. said he had been telling his mother he got hurt at school because father had threatened to hurt him even worse if he told anyone about the hitting. S.Y. expressed fear that father would come to his school to try to take him.

Mother reported that on April 6 father had grabbed her by the neck and choked her in front of S.Y. She also reported that despite having left the home on April 10 at the direction of the social worker, father was nevertheless constantly calling her and the maternal grandmother, and threatening acts of violence against the whole family. Mother said the calls to her occurred daily and were from a new phone number she did not recognize. Sometimes father would say "I am going to bomb everyone." Mother said she had filed a police report with the Monterey Park Police Department. Mother gave the phone number to the social worker. When the social worker called the number, father answered. The social worker gave father notice of the detention hearing and that a petition was going to be filed to remove the children from his custody.

On May 5, 2015, the children were detained pursuant to a removal order, and were released to mother's custody.

4

On May 8, 2015, the Department filed a petition pursuant to section 300, subdivisions (a), (b) and (j). The petition alleged physical abuse of S.Y. resulting in bruising and physical marks, past domestic violence by father against mother including attempted strangulation, and ongoing violent behavior and threats of violence by father including killing the family dog by hitting it with a metal pole, which placed both S.Y. and T.Y. at risk of physical and emotional harm.

The Department sought a restraining order against father with mother's assistance. In her supporting declaration, mother detailed father's violent behavior and regular threats of further violence, including the incident on April 6, 2015, in which he attempted to strangle her in front of S.Y. She said father admitted to her that he beat the dog to death because he was in a bad mood and also to get back at her for initiating the prior dependency proceeding. Mother explained that father repeatedly threatened both her and the boys, saying he would kill them if they told the truth to the police about what happened to the dog. Mother said that father had always been verbally abusive, and had physically attacked her in the past, including kicking her while she was pregnant and causing a miscarriage, but she believed his violence had recently "escalated." Mother said she feared father would kill her and the boys. Mother requested a formal order directing father to move out of the family home, but acknowledged that father had left the home with some things on April 10 after the social worker told him to leave.

At the May 27, 2015 hearing on the restraining order, the Department submitted on the reports and mother's declaration. Father testified and denied all wrongdoing. Father denied having attempted to strangle mother, claiming instead that he was giving her a "massage." As for the dog, father said it died accidentally when it moved its head in the way of the broom that the father was using to punish it for relieving itself in the garage.

After hearing argument, the court explained that it found mother's supporting declaration to be detailed and compelling, and corroborated by the statements of the boys and the Department's report. The court also noted it found father's testimony to lack credibility. The court granted a three-year permanent restraining order directing father to

stay 100 yards away from mother, S.Y. and T.Y., their home, the boys' schools, and mother's place of employment. The restraining order further provided that father must not "[m]olest, attack, strike, stalk, threaten, sexually assault, batter, harass, destroy the personal property of, or disturb the peace" of mother, S.Y. and T.Y. The order precludes any visitation by father except for contact with the boys through "conjoint counseling only" when it was deemed appropriate. Any modifications to the visitation order would have to be addressed to the court.

In the jurisdiction and disposition report, the Department reported on the prior 2012 dependency proceedings in which mother disclosed that father had blocked her and the boys from entering the home, demanded money from her, and threatened to kill her and the boys. When mother told father she was calling the police, father told her to "[g]o ahead" as he was not afraid of the police. The report also documented that in further discussions with T.Y., he disclosed that he had been regularly hit by father when he was S.Y.'s age. T.Y. said he heard his father killing their dog. He was upset about it and said he no longer wanted to see father. He had hoped father would change after the last dependency case, but he did not.

The report also detailed further discussions between the social worker and mother. Mother said that after father killed their dog, he said "so what," and told her she was a "stupid bitch" because she did not know he had killed the previous dog by cutting off its head and throwing it in the trash. Mother called father a "monster." She said that when father had tried to strangle her, he also snatched her phone away and broke it, saying "DCFS cannot help you." She expressed being in constant fear of father and that she always tried to stay alert for his possible appearance. T.Y. helped mother install a security camera system in their home so they can monitor what is going on outside. Mother reported she saw father driving on their street in front of their home. Mother tried to take pictures, but could not get a good shot. Mother showed a few pictures of father's car on her cell phone to the social worker. T.Y. corroborated mother's statements that father was driving by their home, as well as his school.

6

The social worker reported that in speaking with father he denied all wrongdoing, saying mother turned the boys against him, made things up and was mad at him for not making enough money. He did admit he killed the dog but said he did so by accident trying to punish it for making a mess in the garage. Father said he worked hard, was tired all the time, and was too tired to do these "stupid things" that mother and the boys reported. He was angry because he did not have a place to stay and did not like staying in a motel.

At the contested adjudication hearing on June 30, 2015, the court sustained the allegations, as amended, and declared both S.Y. and T.Y. to be dependents pursuant to section 300, subdivisions (a), (b), and (j). The court found by clear and convincing evidence that the boys were at substantial risk of harm if returned to father. The court identified the permanent plan as placement of the boys with mother. The court ordered services for mother, the boys and father, including individual counseling and conjoint counseling if deemed appropriate. The services ordered were consistent with the case plans submitted by both mother and father.

The court ordered no visitation for father, except for monitored visitation through "conjoint counseling only" when deemed appropriate, consistent with the restrictions on visitation set forth in the May 27, 2015 restraining order.

This appeal followed. After the filing of the appeal, the juvenile court terminated dependency jurisdiction. The Department filed a motion to augment the record and requested this court to take judicial notice of the juvenile court orders granting sole legal and physical custody of S.Y. and T.Y. to mother with no visitation for father, and terminating dependency jurisdiction. We granted the motion and take judicial notice of the juvenile court's orders of February 17 and February 19, 2016.

On April 1, 2016, the minors filed a letter brief joining in the brief filed by the Department.

**DISCUSSION**

## 1. The Jurisdiction Order

Father contends the court erred in asserting dependency jurisdiction. He argues there is insufficient evidence supporting any of the allegations under section 300, subdivisions (a), (b) and (j). We disagree.

We review jurisdictional orders for substantial evidence in a light most favorable to the juvenile court's findings. (*In re K.S.* (2016) 244 Cal.App.4th 327, 337; accord, *In re Heather A*. (1996) 52 Cal.App.4th 183, 193.) The record contains solid evidence in support of the court's assertion of jurisdiction over the two minor boys.

Jurisdiction under section 300, subdivision (a) may be asserted where the juvenile court finds, by a preponderance of the evidence, that the "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent." Under subdivision (b), it may be asserted where the "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child." And, under subdivision (j), jurisdiction may be asserted where the "child's sibling has been abused or neglected, as defined in subdivision (a), (b), (d), (e), or (i), and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions."

Father attempts to downplay the seriousness of his behavior, arguing there was no ongoing risk of harm and that the restraining order issued May 27, 2015, adequately protected S.Y. and T.Y. Father relies in part on *In re Daisy H.* (2011) 192 Cal.App.4th 713 in which jurisdictional findings were reversed where the evidence showed only one 2-year-old incident of domestic violence between the mother and the father who no longer lived together, but shared custody of their minor children. The court found such evidence failed to demonstrate a current risk of harm. (*Id*. at p. 717.)

The record here involves far more serious and aggravated facts. In the spring of 2015, father had repeatedly inflicted bruises on S.Y. by hitting him; conduct that went undetected for months because father threatened S.Y. with even greater harm or violence

8

against other family members if he said anything about the hitting. T.Y. had been similarly abused by father when he was S.Y.'s age. Father had a long history of physical and emotional abuse of mother, including serious incidents that occurred in the presence of one or both of the boys. Shortly after the initial referral that precipitated this proceeding, father attempted to strangle mother in front of S.Y., and snatched her phone from her, breaking it, telling her that the Department could not help her. Father beat the family dog to death in the presence of S.Y., lied about it to the police, and threatened mother and both boys about telling the truth to the police or the Department about what had actually happened. Father made daily threats of violence to mother, and continued to stalk and harass the family, driving by their home and the boys' schools after moving out of the family home on April 10. Despite the Department's prior intervention in 2012 and services provided to father, he continued to engage in behavior that, as described by mother, was escalating as of March 2015. Father ignored court orders and told mother he was not afraid of the police or the Department, and dwelt in the home whenever he pleased. Moreover, father continued to deny all wrongdoing and showed no indication that he would curtail or modify his aggressive and violent behavior. The record contains abundant evidence of past harm to S.Y. and a substantial risk of future harm to both S.Y. and T.Y., warranting the court's exercise of jurisdiction. (*In re R.C.* (2012) 210 Cal.App.4th 930, 944.)

## 2. The Removal Order

Father contends there is no evidence he was a custodial parent at the time the petition was filed and therefore, there was no statutory basis for the court's removal order under section 361, subdivision (c). Alternatively, father argues that even if the court had the authority to issue a removal order as to him, the order is not supported by substantial evidence.

We first address the Department's contention the issue was forfeited by father's failure to object in the juvenile court. The record contains no objection by father on the grounds he was a noncustodial parent at the time the petition was filed. Whether the juvenile court properly applied its statutory authority to order removal under section 361,

9

subdivision (c) presents a question of law for which forfeiture is not automatic. We may exercise our discretion to address the issue. (See, e.g., *In re Dakota J.* (2015) 242 Cal.App.4th 619, 630; *In re Jonathan P.* (2014) 226 Cal.App.4th 1240, 1252.)

Father argues that since he moved out of the home on April 10 at the direction of the social worker, he was not a custodial parent three weeks later when the petition was filed. Father asks us to ignore the reality that he entered and lived in the family home at his pleasure, despite changed locks, court orders and risk of police intervention. For all practical purposes father resided in the family home at the relevant time and was *the* offending parent that precipitated the Department's intervention. By his own admission, father was living in the family home up until April 10, 2015, when the social worker told him to leave the home while investigating the current referral. After leaving the home on April 10, father went to a motel, and there is nothing in the record indicating he found a permanent alternative living arrangement or intended to do so. Moreover, father continued to stalk and harass mother and the boys, constantly appearing outside the home, driving on the street, going by the boys' schools, and making threatening phone calls to mother on a daily basis. Father told mother he did not fear the police or the authority of the Department. Mother, S.Y. and T.Y. were under constant threat of father returning to the home and once again imposing his presence there. There is no reason to believe father would not return to the family home to perpetrate further violence against the boys and their mother. We do not hesitate to find father was a custodial parent from whom the children required the protection of the dependency court.

The Department argues that father's alternative contention, that the removal order is not supported by substantial evidence, was also forfeited. However, "[w]e review a dispositional order removing a child from parental custody for substantial evidence." (*In re D.G.* (2012) 208 Cal.App.4th 1562, 1574; accord, *In re A.R.* (2015) 235 Cal.App.4th 1102, 1116.) A claim that the evidence is insufficient to support a dispositional order "is not forfeited even if not raised in the dependency court." (*In re R.V., Jr.* (2012) 208 Cal.App.4th 837, 848.) We therefore address the merits.

Under section 361, subdivision (c)(1), a dependent child shall not be taken from the physical custody of his or her parents unless the juvenile court finds by clear and convincing evidence that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." " ' "The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. *The focus of the statute is on averting harm to the child.*" [Citation.] The court may consider a parent's past conduct as well as present circumstances.' [Citation.]" (*In re A.S.* (2011) 202 Cal.App.4th 237, 247, italics added.)

As explained above in part 1, the record is replete with evidence of father's increasingly violent and threatening behavior. The record contains ample evidence supporting the court's determination that the only means of averting further harm to S.Y. and T.Y. was to remove them from father's custody. (*In re D.G.*, *supra,* 208 Cal.App.4th at p. 1574.)

## 3.     The Visitation Order

Father contends the court's dispositional order regarding visitation improperly delegated authority to the therapist to set the visitation schedule. The Department argues the order was lawful, but that even assuming there was error, the contention has been rendered by moot by the juvenile court's termination of jurisdiction during the pendency of this appeal.

We agree the juvenile court's termination of jurisdiction has mooted father's appeal of the visitation order. (*In re N.S.* (2016) 245 Cal.App.4th 53, 60 ["critical factor in considering whether a dependency appeal is moot is whether the appellate court can provide any effective relief if it finds reversible error"].) There is no longer any dependency proceeding in which visitation is at issue. Mother has been granted sole physical and legal custody of both minor boys and the three-year restraining order

11

remains in effect. Any issues father wishes to raise regarding contact with S.Y. or T.Y. may be directed to the superior court in a new proceeding. (§ 362.4.)

Further, even if we concluded the issue was not moot, father failed to object to the visitation order and therefore forfeited any argument on this ground. Indeed, the record demonstrates that father acquiesced during the proceedings to visitation being limited to participation in counseling. At the May 27, 2015 hearing on the restraining order, father requested that he be allowed contact with the boys in a therapeutic setting. The restraining order provides that monitored visitation could occur in a therapeutic setting when deemed appropriate by the therapist. The court's subsequent visitation order has the same language to which father agreed in the protective order.

## DISPOSITION

The appeal is dismissed in part as to that portion of the court's June 30, 2015 dispositional order regarding visitation in light of the juvenile court's termination of jurisdiction on February 19, 2016.

The balance of the court's jurisdictional and dispositional orders issued June 30, 2015, are affirmed.


GRIMES, J.

WE CONCUR:


BIGELOW, P. J.


RUBIN, J.