Filed 9/8/16  In re B.T. CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re B.T., a Person Coming Under the Juvenile Court Law. | B268317 |
| | (Los Angeles County Super. Ct. No. DK05046) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| M.L., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Amy Pellman, Judge.  Affirmed.

Karen J. Dodd, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, R. Keith Davis, Acting Assistant County Counsel, and Sarah Vesecky, Senior Deputy County Counsel, for Plaintiff and Respondent.

M.L. (Father) is the biological, or "natural," father of his son B.T. When B.T. was about four months old, the Department of Children and Family Services (DCFS) filed a petition to declare B.T. a dependent child under Welfare and Institutions Code section 300(b).[1] At the time, B.T.'s mother A.T. (Mother) had physical custody of him and Father was incarcerated. The juvenile court found jurisdiction was proper under section 300, removed B.T. from Mother's custody, and ordered B.T. suitably placed. Later, when Father was released from custody, the juvenile court permitted him to participate in the proceedings, finding DCFS did not earlier exercise due diligence to discover his whereabouts. DCFS then filed a section 342 petition with allegations against Father under section 300, based on his 34-year history of substance abuse and an incident of domestic violence with Mother. The juvenile court sustained the section 342 petition and ordered B.T. removed from Father's physical custody. Although DCFS concedes this removal order was "in error" because B.T. was not in Father's physical custody at the time the petition was filed, DCFS urges us not to disturb the order because Father's notice of appeal is defective and the error was harmless in any event. We consider whether DCFS is correct on either score.

## I. BACKGROUND

Mother and Father separated when she was six months pregnant with B.T., in the fall of 2013. They were no longer living together when B.T. was born in January 2014. Mother was living in a shelter for pregnant women and Father was living with his parents in Perris, California.

Just over two months after B.T.'s birth, DCFS received a referral alleging Mother was neglecting and abusing B.T. by, among other things, hitting him and screaming at him. Ultimately, at DCFS's recommendation, Mother enrolled in Heritage House's

---

[1]     Undesignated statutory references that follow are to the Welfare and Institutions Code.

inpatient alcohol and drug treatment program, which permitted children to live with the parent while the parent was undergoing treatment.

At about the same time, Father was taken into custody (after a revocation of bail) on a 2013 charge of domestic violence against Mother. Father was convicted and sent to Wasco state prison.

During Mother's first six weeks at Heritage House, staff members expressed concern to DCFS about Mother's ability to care for B.T. A medical social worker from Children's Hospital called DCFS and expressed concern for B.T.'s safety. This prompted DCFS to detain B.T. pursuant to a removal warrant and place him in foster care. Three days later, DCFS filed a section 300 petition alleging B.T. was at risk of harm due to Mother's substance abuse; DCFS later filed a first amended petition that added an allegation that Mother suffered from Bipolar Disorder, which endangered B.T.

In a June 30, 2014, report in advance of the jurisdiction and disposition hearing on the allegations against Mother in the petition, DCFS identified M.L. as an alleged father of B.T. with unknown whereabouts. DCFS stated that it had been unable to locate M.L., and attached a due diligence declaration describing the efforts it had undertaken to locate him. DCFS recommended the court provide no reunification services to Father because his location was unknown and he was an alleged father only. At the jurisdiction hearing, the juvenile court found the allegations against Mother in the first amended petition true (as amended by interlineation) and removed B.T. from Mother's physical custody pursuant to section 361, subdivision (c).[2] The court further found B.T.'s existing foster care placement was appropriate and the court ordered there would be no reunification

---

[2] Section 361, subdivision (c) authorizes a juvenile court to remove a dependent child from the physical custody of parents with whom the child resides at the time the petition was initiated if the court finds by clear and convincing evidence there is or would be a substantial danger to the health, safety, or well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can otherwise be protected.

3

services for Father, who had not appeared in the proceedings and whose whereabouts were then unknown.[3]

Father was released from prison on February 12, 2015. DCFS's records show that Father had telephone contact with DCFS staff on February 19, 2015. Father subsequently completed a Statement Regarding Parentage that asked the court to determine if he was B.T.'s biological father and to enter a judgment of parentage.

Not long thereafter, Father filed a section 388 petition and asked the court to vacate its prior orders on the ground that DCFS did not exercise due diligence in attempting to locate him. Father asked "to have his day in court represented by counsel, including the opportunity to establish paternity and seek custody." The juvenile court ordered DNA testing for Father, which established he was B.T.'s natural father, and the court also granted a hearing on the section 388 petition.

When the court held the hearing on the section 388 petition, which was combined with the 12-month review hearing on Mother's efforts to reunify with B.T., Father was present with counsel. Father told the court he was in custody when DCFS filed the original section 300 petition seeking court jurisdiction over B.T. The offense for which he had been in custody concerned a domestic violence incident involving Mother, which had taken place about a year earlier. Father's counsel implicitly acknowledged that Father was not a presumed father, but contended that he "could qualify as [a] presumed father under the law and could be entitled to custody."

The court granted the section 388 petition in part. The court found DCFS did not exercise due diligence when it failed to attempt to find Father through the inmate locator. The court found, however, that the only harm Father suffered from the lack of notice was that the court had not earlier found he was B.T.'s natural father. The court pointed out that as only a natural father (not a presumed father), Father was not automatically entitled

---

[3] Section 361.5, subdivision (b)(1) states reunification services need not be provided to a parent if a juvenile court finds by clear and convincing evidence the parent's whereabouts are unknown.

to custody or reunification services. The court explained the question of whether to order reunification services was one within the court's discretion and it would not exercise its discretion to order such services.[4] The court stated it would, however, order visitation for Father, adding "if he would like to work towards being [a] presumed [father], I , certainly, encourage him to do that and I, certainly, encourage him to continue visiting and address whatever issues he believes [are] keeping him from requesting custody, if he wants to obtain status of presumed." The court directed DCFS to meet with Father to discuss the possibility of unmonitored visits, and ordered DCFS to make a home visit.

Father noticed an appeal from the juvenile court's order, which denied him a new disposition hearing and all associated rights, including reunification services. His appellate attorney filed an opening brief pursuant to *In re Phoenix H.* (2009) 47 Cal.4th 835, and we dismissed his appeal as abandoned.

The matter proceeded in the juvenile court while Father's prior appeal was pending. On August 11, 2015, DCFS filed a subsequent petition under section 342 regarding B.T., then 19 months old.[5] The petition alleged Father's 34-year history of substance abuse and related criminal history "endanger the child's physical health and safety and create a detrimental home environment, placing the child at risk of serious physical[ ] harm, damage and failure to protect." The petition also alleged there was a substantial risk that B.T. would suffer serious physical harm because Mother and Father had engaged in a prior violent altercation.

---

[4]     The juvenile court explained it chose to exercise its discretion to deny such services because father "has missed 50 percent, I think, over 50 percent of the visits that were already offered to him. He did sit on his rights. He did know the child was going to be born. He did not appear . . . to really make any diligent effort to contact the mother to find out about the birth of his child. It wasn't until the Department finally contacted him in December, at which point, he again sat on his rights until February."

[5]     A section 342 petition is used to allege new facts or circumstances, other than those under which an original petition was sustained, that would further justify jurisdiction over a child under section 300.

In the detention report filed concurrently with the petition, DCFS summarized three interviews a social worker had conducted with Father. He discussed his criminal history, which began at the age of 18 for driving under the influence (DUI). Additional DUI convictions followed. Father acknowledged an arrest for domestic violence with his first wife in 1998 or 1999, and a subsequent arrest in 2005. Father was also arrested in 2013 for inflicting corporal injury on Mother. In addition, Father discussed his substance abuse history. He began drinking alcohol and using marijuana at the age of 15. He used cocaine, methamphetamine, and other substances when younger, but quit using cocaine in about 2000 and methamphetamine in May 2014. Father acknowledged he had a medical marijuana card but initially claimed that he had not used marijuana since his arrest in 2014. He then clarified that he had smoked a small amount of marijuana with his adult son two days prior to the interview.

The detention report also summarized Father's visits with B.T. Since June 1, 2015, monitored visits had been set up for Father on Mondays at a park in Corona, California. Father attended three visits, cancelled four visits, and failed to show up or cancel an additional two visits. Thus, Father attended about one-third of the visits, all of which lasted about an hour. Father was reluctant to undertake longer visits in the community, but was interested in having longer visits with B.T. in Father's home.

In a Last Minute Information report filed with the court shortly before the adjudication hearing on the subsequent petition, DCFS described the results of walk-through of Father's residence. The social workers were able to view the entire downstairs area of the home and Father's sleeping area, which was a couch in a common room upstairs. There were also two bedrooms upstairs, both of which were locked, that the social workers could not view; one room was occupied by two tenants, the other by Father's adult son. When asked whether there were any weapons in the home, Father said there were not, but he also "stated that the adult son's room remains locked so that if Probation [Officers] were to stop by they would know that whatever things his son has in his room aren't associated with [Father]."

6

At the adjudication hearing on the subsequent petition, the court sustained the counts alleged under section 300(b), as amended by interlineation. Specifically, the court found B.T. "continues to be the person described under Welfare and Institutions Code [section] 300" based on the substantial risk of harm to the child presented by Father's substance abuse and Mother and Father's history of engaging in violence, "such [as] in 2013, when father slapped the mother." The court then asked if anyone wanted to be heard concerning disposition. Father's counsel requested to continue the matter so that Father could continue attempts to enroll in the Cherokee nation and to give Father "a fair opportunity to present his case to the court regarding reunification services," which DCFS had recommended the court deny. Further discussion ensued, and the court ordered the parties back on October 19 for a contested hearing on disposition.

Father was not present at the October 19 hearing. Father's counsel presented several character reference letters written on Father's behalf. Father's counsel then asked the court to exercise its discretion and offer Father reunification services. Counsel argued, "My client has stepped up in regards to going forth with the paternity tests. And, he's the biological father. . . . My client has been coming to court. He has had visitation." Counsel acknowledged Father's significant criminal history but pointed to the letters of reference vouching that he "is an excellent father, an outstanding father [to his other, now-adult children]." Unpersuaded, DCFS and counsel for B.T. recommended the court continue to deny reunification services.

The court declined to order family reunification services for Father, who, the court stated, "continues to be an alleged father." Using language we will revisit momentarily, the transcript of the hearing indicates the court further ordered as follows: "The court finds that continuance in the home of both parents is contrary to the child's welfare. [¶] The court finds by clear and convincing evidence pursuant to [section] 361(c) that there is substantial danger to the physical health, safety, protection, or physical or emotional well-being of the child if the child were to be returned home. And there are no reasonable means by which the child's physical health can be protected without removal from the parent's physical custody. Care, custody and control are placed with the

7

Department.  [¶]  Reasonable efforts have been made to prevent and eliminate the need for the child's removal."

After the continued hearing on disposition, Father timely filed a notice of appeal which states he is appealing from:  "All findings and orders made during the adjudication on September 29, 2015.  Denial of reunification services at the Dispositional hearing on 10-19-2015."

## II.  DISCUSSION

Father interprets the juvenile court's dispositional order as one that removed B.T. from his physical custody, and he argues this was error.  He asserts a child may only be removed from the physical custody of a parent with whom the child resides, and since B.T. never resided with Father, the court's order removing B.T. from Father's physical custody was erroneous.  DCFS notes the ambiguity in the record as to whether the court's removal order at the October 19 hearing was meant to apply to both Mother and Father, see *ante* ("both parents" vs. "the parent's"), but DCFS proceeds on the understanding it applied to Father and concedes the order was erroneous for the reason Father identifies.  The agreement between the parties, however, ends there.  DCFS contends we should dismiss the appeal in any event because Father's notice of appeal does not clearly challenge the removal order.  DCFS further asserts any error was not prejudicial because the record demonstrates there was no legal basis on which Father could have obtained physical custody of B.T.  We agree with DCFS on the second point.  Any error was harmless because a natural father is not entitled to physical custody under the applicable statute, section 361.2, and the removal order had no legal effect on the availability of reunification services, which the court had by then already exercised its discretion to deny.

8

A.      *DCFS's Motion to Dismiss*

After Father filed his notice of appeal, he filed an opening brief in which he asserts the court erred in removing B.T. from Father's physical custody because B.T. never resided with Father.  He contends the court should have placed B.T. with him instead.

DCFS filed a motion to dismiss, asserting we lack jurisdiction to hear the claims raised in Father's brief because those claims are not listed in his notice of appeal.  DCFS argues the court's removal order was made at the October 19 hearing, but Father's notice of appeal limits his appeal from the October 19 hearing to the court's refusal to grant family reunification services.

Father opposes dismissal and requests that we liberally construe his notice of appeal to include the challenge to the removal order he presents for our review.  Seeing no prejudice to DCFS, we give the notice such a construction and reach the merits of his contentions.  (California Rules of Court, rule 8.100(a)(2); *In re Madison W.* (2006) 141 Cal.App.4th 1447, 1450.)

B.      *The Removal Order Is, At Most, Harmless Error*

Section 361, subdivision (c) provides in relevant part:  "A dependent child shall not be taken from the physical custody of his or her parents or guardian or guardians with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence . . .  [¶]  (1) There is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's or guardian's physical custody. . . . The court shall consider, as a reasonable means to protect the minor, each of the following:  [¶]  (A) The option of removing an offending parent or guardian from the home.  [¶]  (B) Allowing a nonoffending parent or guardian to retain physical custody as long as that parent or guardian presents a plan acceptable to the court demonstrating that he or she will be able to protect the child from future harm."  It is undisputed that B.T. never resided with Father.  Thus, an order removing B.T. from

9

Father's physical custody pursuant to section 361, subdivision (c)(1) would be erroneous. (*In re Dakota J.* (2015) 242 Cal.App.4th 619, 627-630.)

Father contends the removal order was prejudicial, as he must to obtain reversal, because the trial court should have instead considered whether to place B.T. with him under section 361.2 and it is reasonably probable he would have obtained physical custody under that statute. (See, e.g., *In re Celine R.* (2003) 31 Cal.4th 45, 59-60 [reversal warranted only where error is prejudicial, meaning a more favorable outcome would be "reasonably probable" absent the error].) As relevant here, section 361.2 provides as follows: "When a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child. If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child." (§ 361.2, subd. (a).)

Father's argument fails because he would not have been entitled to custody under section 361.2. "[O]nly a presumed father is entitled to assume immediate custody" under section 361.2. subdivision (a). (*In re Zacharia D.* (1993) 6 Cal.4th 435, 454 (*Zacharia D*).) Father was not a presumed father at the time of either the original dispositional hearing or the later dispositional hearings on the section 342 subsequent petition.[6] Father counters by asserting the court's ruling in *Zacharia D*. does not preclude application of section 361.2 to natural fathers because the court explained that "the statute assumes the

---

[6] "Presumed fatherhood, for purposes of dependency proceedings, denotes one who 'promptly comes forward and demonstrates a full commitment to his paternal responsibilities—emotional, financial, and otherwise [.]' [Citation]." (*In re Jerry P.* (2002) 95 Cal.App.4th 793, 801-802.) Father's consistent status as at most a natural father makes it unnecessary for us to address whether section 361.2 applies only at the time the child is first removed from the custodial parent or guardian's home, which in this case would have been long before the dispositional hearing on the section 342 subsequent petition.

10

existence of a competent parent able to immediately assume custody" ( *Zacharia D.,* *supra*, 6 Cal.4th at p. 454), which he believes he is.  Father has taken this quote out of context.  Our Supreme Court unmistakably held section 361.2 applies only to presumed fathers.  (See, e.g., *In re Liam L.* (2015) 240 Cal.App.4th 1068, 1080, fn. 5 [citing *Zacharia D.* for the proposition that "[a] mere alleged or biological father does not qualify as a 'parent' under this statute; he must obtain presumed father status"].)

Moreover, Father's argument is unpersuasive even on its own terms.  Although Father contends that he had a home for his child, the record does not support that contention.  Father shared a home with three others, and DCFS was unable to complete a walk-though of the residence because (a) the other residents kept their doors locked, and (b) DCFS had not been able to do background checks on the other residents.  Plus, the record also reveals Father's multiple drug-related offenses and prior incidents of domestic violence, in addition to his inconsistent visitation and lackluster efforts to inquire as to B.T.'s welfare.  We are confident a request for physical custody under section 361.2, if made, would have been denied as detrimental to B.T.'s well being.

Father further maintains that even if he were not entitled to immediate custody, he was prejudiced by the removal order because it started the clock running for reunification services, and eventually for termination of parental rights.  This argument fails.  The removal order on October 19, 2015, had no effect on the unavailability of reunification services for Father.  As we highlighted when summarizing the factual and procedural background of this case, the juvenile court had already denied Father reunification services in connection with his section 388 petition, and while Father noticed an appeal from that determination, we dismissed that appeal as abandoned.  And as to the "clock" for reunification services, that had begun running earlier, when B.T. was removed from Mother's custody.

11

DISPOSITION

The juvenile court's removal order is affirmed.


NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS



BAKER, J.


We concur:



TURNER, P.J.



RAPHAEL, J.*

---

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.