Filed 7/22/21  In re L.S. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re L.S. et al, Persons Coming Under the Juvenile Court Law. | D078535 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. Nos. J520350A-B) |
| v. | |
| B.A., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Marian F. Gaston, Judge.  Affirmed.

Shobita Misra, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of County Counsel, Caitlin E. Rae, Chief Deputy County Counsel and Emily Harlan, Deputy County Counsel for Plaintiff and Respondent.

B.A. (Mother) appeals a dispositional order entered in a juvenile dependency proceeding removing her older son, L.S, from her custody

pursuant to Welfare and Institutions Code[1] section 361, subdivision (c)(1). The San Diego County Health and Human Services Agency (the Agency) initiated the dependency proceeding after Mother's younger son, M.S., was hospitalized with multiple injuries from abuse. Mother contends substantial evidence does not support the juvenile court's dispositional findings. She also claims the court erred by failing to consider less drastic alternatives when it ordered that L.S. be removed from her care. We reject these challenges and affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

1. *Abuse of L.S.'s Sibling*

Mother and J.S.[2] (Father) have two sons, five-year-old L.S. and one-year-old M.S. On April 7, 2020, Mother took then six-month-old M.S. to the hospital after she noticed he was having difficulty using his left arm and appeared to be in pain. Evaluations at the hospital revealed M.S. had multiple injuries in different stages of healing. This included a spleen injury; bruising of the left arm, right hip, abdomen, lower back, and ears; a scabbed lesion and healing trauma on the left calf; bite marks on his left cheek and right hand; multiple fractures of several extremities; and complex skull fractures. A group of child abuse doctors concluded M.S.'s injuries were highly specific for abuse, as the injuries were consistent with squeezing, yanking, slamming or falling, and forceful grabbing.

---

[1]     Undesignated statutory references are to the Welfare and Institutions Code.

[2]     J.S. is the presumed father of L.S. and M.S. He is not a party to this appeal.

Earlier medical records also showed that M.S. had been taken to the hospital when he was 14 days old for inconsolable crying. During this hospital visit, M.S. was found to have a bruise on his left hand and wrist. One child abuse doctor determined this injury was also indicative of abuse.

Mother initially could not explain M.S.'s injuries other than suggesting that then four-year-old L.S. was to blame. During her interview with the investigating social worker, she described L.S. as "naughty" and "rough" with M.S. She reported that two weeks prior to M.S.'s hospitalization, L.S. was jumping on the bed and fell on M.S. Mother indicated that M.S.'s hospitalization made her realize L.S. needed help for his hyperactivity.

Mother also suggested Father could be responsible for some of M.S.'s injuries. For instance, she reported witnessing Father grab and squeeze M.S. to the point that the child would grunt. However, she later said Father was not at fault and was a "loving father" to the children.

Mother also accused the children's maternal step-grandfather, who lived with the family at the time, of abusing M.S. She told the social worker the step-grandfather drank excessive amounts of beer daily and used to use methamphetamine. She also disclosed that this step-grandfather sexually abused her as a child. She acknowledged that it had not been safe for her to leave her children alone with their step-grandfather.

Although L.S. was interviewed, he was initially unable to give any details about the abuse. When asked by a forensic interviewer what happened to M.S., L.S. replied, "baby crying, mama, papa[,] Tata," with "Tata" referring to his paternal step-grandfather. His speech then became incomprehensible, and the forensic interviewer ended the interview due to L.S.'s speech impediment

2. *L.S.'s Dependency Proceedings*

Following the diagnosis that M.S. had suffered multiple injuries indicative of abuse, the Agency filed dependency petitions on behalf of both siblings. L.S.'s petition alleged he was at substantial risk of suffering harm based on the injuries suffered by his brother. (See § 300, subd. (j).) The Agency created a safety plan for L.S. and M.S., removing the children from the parents' custody and placing them with family members.

After the children were removed from the home, the parents had a domestic violence dispute. According to the police report, Mother pushed Father, causing him to fall and sustain minor injuries. The couple separated and Mother began living with relatives.

This domestic violence incident occurred while Mother had been participating in family reunification services, including a 52-week child abuse group, in-home parenting, and individual counseling. As of mid-December 2020, Mother's child abuse group progress report indicated that Mother still had 25 sessions remaining before completing the program. She received lower scores in the areas of acceptance of responsibility, empathy, and insight, where the report specifically noted the need for improvement. For example, although Mother had acknowledged M.S. "got hurt," she had not expressed empathy for his experience and her acknowledgement of responsibility was limited.

L.S. also began receiving behavioral services. A family caregiver reported L.S.'s behavior and speech had improved since being placed in her care. L.S. also had a second forensic interview, in which the interviewer noted that L.S.'s verbal abilities had "greatly improved" since being placed in protective custody. When asked in the second interview about how his brother was hurt, L.S. stated, "daddy hit [M.S.]." L.S. demonstrated how

4

M.S. was hit with his open hands and then with fists to his face. He said he felt "mad" and "sad" when his brother was hurt.

A paternal aunt and uncle provided additional details about the parent's treatment of the children. These relatives had lived with the family for two months. They reported to a social worker that they did not view the step-grandfather as responsible for M.S.'s abuse, and that they believed the children would not be safe if returned to the parents' care. They reported that L.S. was hyperactive, "really wild," and the parents were "too rough" with him. The paternal aunt described both parents as "physical" with the children, and that Mother was the more aggressive parent. The paternal aunt reported observing Mother hit L.S. "on the butt" with an open hand and with clothes on. She also reported witnessing Mother pull L.S.'s hair and ears.

The contested adjudication and disposition hearing was held on January 28, 2021. The juvenile court received the Agency's reports into evidence along with the social worker's stipulated testimony. The social worker stated that she had spoken to Mother one week prior to the hearing. According to the social worker, Mother was currently living in a one-bedroom apartment with her cousin and did not want to reunify with the children until she found her own place. The Agency's most recent report also noted that Mother had "some anxiety about having the children in her care." Additionally, Mother had begun to suspect Father was responsible for M.S.'s injuries.

As to the evidence submitted on Mother's behalf, the juvenile court received progress reports from Mother's education classes and individual therapy, visitation logs from her supervised visits with the children, Mother's handwritten child abuse prevention plan, an apology letter to her children,

5

her stipulated testimony, and a police report showing Mother was never arrested for the domestic violence incident with Father. According to Mother's stipulated testimony, her cousin had given permission for the children to move in while Mother looked for her own place to live.

Although the specific perpetrator of M.S.'s abuse had not been identified, the Agency took the position that because the parents were M.S.'s primary caregivers at the time of the abuse, one parent was the abuser and the other parent knew or reasonably should have known about the abuse. As to disposition, the Agency requested removal of both children due to the substantial danger posed by remaining in the parents' care. In the Agency's view, Mother was not ready to have custody because she was looking for housing and was still in the process of accepting responsibility and developing insight about the abuse. The Agency indicated that Mother could potentially move forward to unsupervised visitation after the parameters were discussed. The Agency's arguments were adopted by the children's attorney.

Mother's counsel countered that there was no evidence to show Mother had caused M.S.'s injuries, nor had Mother ever physically injured L.S. beyond spanking him for discipline. Although Mother was looking for a larger home, that did not present a protective issue preventing placing the children in her custody. Mother's counsel argued that if the juvenile court found jurisdiction, the court should order family maintenance or, in the alternative, provide for overnight visitation.

In rebuttal, the Agency clarified that its concern about Mother's living arrangement was that, as of one week before the hearing, Mother was still unsure of whether the children could live with her. The Agency further noted that this was a "high risk" case and, given the severity of M.S.'s injuries and

6

the confirmation provided by family members that the parents were aggressive with the children, the Agency did not believe Mother was ready to receive custody.

After hearing arguments from the parties and reviewing the documentary evidence, the juvenile court found the jurisdictional allegations true by clear and convincing evidence as to both children. It further found that reasonable efforts had been made to prevent or eliminate the need for the children's removal and to make it possible for the children to return home. Nonetheless, the court believed removal was necessary due to a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the children if the children were returned home, and concluded there were no reasonable means to protect the children's physical health without removal.[3]

Although the juvenile court recognized that Mother had made progress, it was concerned with her lack of specificity about how M.S. was injured, as this made it "very difficult" for her to protect her children from future harm. The court also referenced the social worker's recent report in which Mother expressed she was not ready for the children to return to her custody, and she was looking for a new place to live with the children. For these reasons, the court determined it would be detrimental to place the children in her care. It nonetheless authorized the Agency to permit Mother to have unsupervised and overnight visits with the children under certain circumstances.

---

[3]     Mother does not challenge the juvenile court's jurisdictional findings as to either child or its removal order as to M.S.

DISCUSSION

Mother's sole challenge in this appeal is to the juvenile court's dispositional order removing L.S. from her custody. She argues the evidence does not support a finding of substantial danger to L.S. if he were returned to her custody. She asserts there is no evidence in the record showing she harmed either of her children, and she claims that other positive equities, such as her participation in reunification services, weigh in her favor. She further contends the court erred by failing to consider less drastic alternatives to L.S.'s removal.

1. *Relevant Legal Principles and Standard of Review*

"After the juvenile court finds a child to be within its jurisdiction, the court must conduct a dispositional hearing. [Citation.] At the dispositional hearing, the court must decide where the child will live while under the court's supervision." (*In re N.M.* (2011) 197 Cal.App.4th 159, 169 (*N.M.*).) " 'The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child. [Citation.]' " (*Id.* at pp. 169–170.) At the dispositional stage, the court may consider a parent's past conduct, present circumstances, and response to the conditions giving rise to the dependency proceedings. (*In re Cole C.* (2009) 174 Cal.App.4th 900, 917.)

To support an order removing a child from parental custody, the juvenile court must find by clear and convincing evidence that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the parent's . . . physical custody . . . ." (§ 361, subd. (c)(1).) The court must also determine

"whether reasonable efforts were made to prevent or eliminate the need for removal of the minor" and "state the facts on which the decision to remove the minor is based." (§ 361, subd. (e).) "The juvenile court has broad discretion to determine what would best serve and protect the child's interest and to fashion a dispositional order in accordance with this discretion." (*In re Jose M.* (1988) 206 Cal.App.3d 1098, 1103–1104.)

The standard of review for a dispositional order is substantial evidence. (*In re Cole C.* (2009) 174 Cal.App.4th 900, 916.) "Substantial evidence is evidence that is reasonable in nature, credible, and of solid value. We do not reweigh the evidence, evaluate the credibility of witnesses or resolve evidentiary conflicts. We draw all legitimate and reasonable inferences in support of the judgment. The appellant has the burden to demonstrate there is no evidence of a sufficiently substantial nature to support the findings or orders. [Citation.]" (*In re D.B.* (2018) 26 Cal.App.5th 320, 328–329 (*D.B.*).)

2. *Substantial Evidence Supports the Juvenile Court's Dispositional Findings*

Mother contends there was insufficient evidence to support removing L.S. from her custody because there is no evidence L.S. had ever been abused or that she had caused M.S.'s injuries. She also points to her demonstrated progress during the reunification services, and that she had a safe and suitable home for L.S. She concludes that the record lacks clear and convincing evidence of a substantial danger to L.S. if he remained in her custody.

Before addressing the juvenile court's dispositional order, we pause to address the jurisdictional findings. Mother contends that jurisdictional findings may serve as prima evidence for removal only in cases under section 300, subdivision (e), where a young child has suffered severe physical abuse and is adjudicated a dependent. Because the court took jurisdiction over L.S.

9

under section 300, subdivision (j), Mother contends the presumption does not apply.

Even assuming the jurisdictional findings would not automatically constitute prima facie evidence at the dispositional stage under the statute,[4] the juvenile court found *clear and convincing* evidence that L.S. was a dependent under section 300, subdivision (j). This is a heightened burden of proof from the preponderance of evidence standard required for taking jurisdiction over a child. (§§ 300, 355, subd. (a).) Because the court applied the elevated clear and convincing standard of proof to the jurisdictional findings, those findings should apply to the dispositional order. (*In re Hailey T.* (2012) 212 Cal.App.4th 139, 146 (*Hailey T.*) ["The elevated [clear and convincing] burden of proof for removal from the home at the disposition stage reflects the Legislature's recognition of the rights of parents to the care, custody and management of their children, and further reflects an effort to keep children in their homes where it is safe to do so."].)

Further, even without the presumption that the jurisdictional findings are prima facie evidence for removal, Mother has not met her burden on appeal to demonstrate that there is no substantial evidence to support the juvenile court's dispositional findings. Mother relies on *Hailey T.*, in which the Court of Appeal reversed the dispositional order removing a four-year-old minor from her parents' custody after her infant sibling was found with a nonaccidental injury to one eye. (*Hailey T.*, *supra*, 212 Cal.App.4th at

---

[4]     We note that several appellate courts have applied the statutory presumption to jurisdictional findings under section 300, subdivision (j), holding that such findings are prima facie evidence that the child cannot safely remain in the home. (See *D.B.*, *supra*, 26 Cal.App.5th at p. 332; *In re T.V.* (2013) 217 Cal.App.4th 126, 135; *Hailey T.*, *supra*, 212 Cal.App.4th at p. 146.)

p. 145.)  In *Hailey T.*, there was disputed expert testimony regarding whether the eye injury was inflicted by the parents or could have been caused by the minor.  (*Id.* at p. 148.)  Additionally, there was no evidence the minor was ever physically harmed in the parents' home or had suffered harm because of the abuse to her sibling.  (*Id.* at pp. 147–148.)  There was also evidence to show the minor would have been capable of reporting any abuse, since she possessed good language skills, and was outgoing and social.  (*Id.* at p. 147.)  The appellate court also noted that the parents had a "healthy relationship," as there was no evidence of any domestic violence between them, and neither parent had any mental health or other issues that would put the minor at a continuing risk.  (*Ibid.*)  The appellate court concluded that although the record supported the court's jurisdictional findings, the record was insufficient to show a substantial risk of harm to the minor if not removed from her parents' custody under the clear and convincing standard of proof.  (*Id.* at p. 148.)

We are not persuaded that *Hailey T.* requires reversal of the juvenile court's dispositional order in this case.  Unlike the eye injury that gave rise to the dependency proceedings in *Hailey T.*, the abuse to L.S.'s sibling was not an isolated incident.  Rather, M.S. was diagnosed with multiple, serious injuries, including a lacerated spleen, bruising, scabbing, bite marks, multiple limb fractures, and a complex skull fracture.  These injuries were indicative of multiple incidents of abuse, as some injuries were in the process of healing, and one injury was at least 10 days old.  In contrast with the dueling expert testimony presented in *Hailey T.*, the undisputed record in this case shows that M.S.'s injuries, with the possible exception of the bite marks, could not have been caused by a child of L.S.'s age.  In fact, four child abuse doctors agreed M.S.'s injuries were highly specific for abuse.  As one of

these doctors opined, given the severity of M.S.'s condition, failure to remove him from the environment where he sustained the injuries would place him at extreme risk of ongoing abuse and potentially death.

In addition to the severity and protracted nature of the abuse inflicted on his brother, L.S.'s situation is further distinguishable from that of the minor in *Hailey T.* because the evidence in the record supports a finding that L.S. *was* physically harmed in his parents' home. L.S.'s paternal relatives contacted a social worker to report their concerns about returning L.S. to his parents' custody, describing both parents as too rough with L.S. for his age, and that Mother was the more aggressive parent. They observed Mother physically disciplining L.S. with spankings, and pulling his hair and ears when he was three years old. This report of abuse to L.S. mirrors to a degree M.S.'s documented injuries, which included bilateral ear bruising.

There is also evidence to contradict Mother's assertion that L.S. was "healthy [and] well cared for" prior to his removal from her custody. Unlike the minor in *Hailey T.*, who could speak in full sentences at the age of three, L.S. had a noticeable speech impediment during his first forensic interview, which made him incapable of providing any details about M.S.'s abuse. There were numerous reports that L.S. had behavioral problems prior to his removal from the home, and Mother even acknowledged that L.S. needed help for his hyperactivity. L.S. was also harmed by witnessing his sibling's abuse, stating he felt "mad" and "sad" when M.S. got hurt. Mother's lack of attention to, or disregard for, the effect on L.S. of witnessing the abuse of his brother further supports the removal of L.S. from her care. (*D.B.*, *supra*, 26 Cal.App.5th at p. 330 [emotional effect of sibling's abuse was probative in determining whether the abuse of the sibling presented a substantial risk to the other child].)

12

Lastly, there is evidence in the record to suggest that Mother was not yet prepared to provide L.S. with a safe home. Prior to the children's removal, the family had been living with an alcoholic relative who had sexually abused Mother as a child, a decision Mother recognizes created an unsafe environment for the children. Although at the time of the dispositional hearing Mother was receiving reunification services and had made progress, she had not yet completed the program and needed to improve in the areas of acceptance of responsibility, empathy, and insight. And unlike the parents in *Hailey T.*, Mother and Father engaged in a domestic violence dispute, which occurred after the dependency case began and despite Mother's participation in services.

Mother further contends the juvenile court erred by failing to separately assess the risk to L.S. Although the court entered separate dispositional orders for each child , the oral dispositional findings did not distinguish between the children individually. We conclude there was no error in the court's analysis, and even if there was, any error was harmless.

The requirement for the juvenile court to analyze each child's circumstances individually at the dispositional stage was articulated in *In re Dakota J.* (2015) 242 Cal.App.4th 619 (*Dakota J.*). In that case, there was clear and convincing evidence to support removal of the child who resided with the mother based on the mother's failure to provide regular care and supervision. (*Id.* at pp. 626–627.) But the juvenile court also ordered removal of her two other children even though those children did not reside with the mother when the dependency petitions were initiated. (*Ibid.*) The appellate court decided that removal of the children residing outside her physical custody was error because section 361, subdivision (c)(1) did not apply to the children who were not in the mother's physical custody. (*Id.* at

13

pp. 627–630.) It further determined that the error was not harmless, citing the mother's ability to recognize her limitations since she had arranged for her two other children to live with a family member. (*Id.* at p. 632.) The court concluded that "where more than one child is the subject of a dependency proceeding, the juvenile court must analyze each child's circumstances independently at the dispositional stage." (*Id.* at p. 632.)

The unique circumstances of *Dakota J.* are not present in this case. Unlike *Dakota J.*, where two of the mother's three children were not in her physical custody when the dependency proceedings were initiated, Mother was L.S.'s primary caregiver at the time of M.S.'s hospitalization. Additionally, the children in *Dakota J.* were found dependents under section 300, subdivision (b), which provides the juvenile court with jurisdiction over a child who has suffered or is at risk of suffering serious physical harm based on the parent's failure or inability to adequately supervise or protect the child. (*Dakota J.*, *supra,* 242 Cal.App.4th at p. 626.) In this case, the juvenile court took jurisdiction over L.S. under section 300, subdivision (j). As our Supreme Court has explained, the statutory provision for dependency jurisdiction based on sibling abuse directly connects the abuse of a sibling to the other child's future risk of harm: "[T]he more severe the type of sibling abuse, the lower the required probability of the child's experiencing such abuse to conclude the child is at a substantial risk of abuse or neglect under section 300. If the sibling abuse is relatively minor, the court might reasonably find insubstantial a risk the [other] child will be similarly abused; but as the abuse becomes more serious, it becomes more necessary to protect the child from even a relatively low probability of that abuse." (*In re I.J.* (2013) 56 Cal.4th 766, 778.) Although the risks posed to the sets of children

14

in *Dakota J.* may have been distinct, the future risk of harm to L.S. is necessarily intertwined with the abuse of M.S.

Additionally, we presume the juvenile court is aware of and followed applicable law. (*In re Julian R.* (2009) 47 Cal.4th 487, 499.) Generally, orders will be upheld if the evidence supports implied findings. (*In re Andrea G.* (1990) 221 Cal.App.3d 547, 554–555.) As the juvenile court correctly observed in this case, Mother had yet to identify the perpetrator of M.S.'s abuse as of the date of the dispositional hearing. At first, Mother blamed L.S. as the cause of M.S.'s injuries. She then began to suggest Father was responsible, although she later said he was not to blame and was a "loving father." Mother then suggested the maternal step-grandfather was to blame. She later told her therapist, following the domestic violence dispute, that she suspected Father again. Based on Mother's inconsistent stories about who was responsible for M.S.'s injuries and her inability to identify the source of the harm, the juvenile court reasonably determined that it would be difficult for Mother to protect both children from future abuse. Although not expressly phrased in these terms, the juvenile court effectively found that Mother's lack of insight presented a risk of harm to L.S. individually.

Even assuming the juvenile court erred by failing to analyze the risk to L.S. individually, any such error was harmless. An error by the court in failing to comply with section 361, subdivision (e) will be deemed harmless if " 'it is not reasonably probable such finding, if made, would have been in favor of continued parental custody.' [ Citations.]" (*In re Jason L.* (1990) 222 Cal.App.3d 1206, 1218.) The undisputed record shows Mother had physically harmed L.S., she failed to seek help for L.S.'s behavioral problems prior to the Agency intervening, and L.S. demonstrated improvement after being removed from her care. Mother was also in the process of developing insight

into M.S.'s abuse and had yet to complete her reunification services. Considering both past and present circumstances, we do not find it was reasonably probable that a ruling more favorable to Mother would have occurred if the court had analyzed L.S.'s risk of harm independently.

3. *Substantial Evidence Supports the Juvenile Court's Finding of No Reasonable Alternatives to L.S.'s Removal*

Mother contends the juvenile court failed to consider less drastic alternatives to removal, instead merely stating in perfunctory language that there were no reasonable means to place L.S. with Mother. She contends family maintenance services were a reasonable option the juvenile court should have considered, as this option would have allowed her to retain custody while still requiring her participation in services under the social worker's supervision.[5]

In the juvenile court, Mother argued for family maintenance, or in the alternative, overnight visits.[6] The record shows that the court considered

---

[5] To the extent Mother contends the juvenile court failed to consider alternatives other than family maintenance, she forfeited this argument by failing to suggest additional options. (*In re S.B.* (2004) 32 Cal.4th 1287, 1293 [dependency matters are not exempt from forfeiture rule], superseded by statute on other grounds as stated in *In re S.J.* (2008) 167 Cal.App.4th 953, 961–962; *In re Daniel D.* (1994) 24 Cal.App.4th 1823, 1831 [by only seeking placement with herself in the trial court, mother waived right on appeal to contend child should be placed with a relative].)

[6] Family maintenance services may be provided if "a child is adjudged a dependent child of the court, on the ground that the child is a person described by Section 300, and the court orders that a parent or guardian shall retain custody of the child subject to the supervision of the social worker, [and] the parents or guardians shall be required to participate in child welfare services or services provided by an appropriate agency designated by the court." (§ 362, subd. (c).)

both options, and it ultimately allowed the Agency discretion to permit unsupervised and overnight visits. However, as to placing L.S. with Mother in conjunction with family maintenance services, the court concluded it would be premature for L.S. to return to Mother's custody. In reaching this conclusion, it cited the "extremely serious injuries" to M.S., and that Mother had not yet demonstrated that unsupervised visitation would not result in injuries. It also referenced Mother's lack of insight into the circumstances that caused the children's removal from her custody, rendering it difficult for her to protect both children from future abuse. Finally, the judge noted that Mother had expressed a week before the hearing that she was not yet ready to receive the children into her home. Contrary to Mother's assertion, the record shows the court considered family maintenance, but it determined that removal was necessary until Mother had sufficient time to develop insight and could demonstrate through unsupervised visits that L.S. would be safe if placed in her care.

Mother contends the juvenile court improperly relied on her housing status, as her limited finances were not legitimate grounds for L.S.'s removal. However, the evidence in the record supports the juvenile court's finding that, as of the date of the dispositional hearing, Mother was not ready to receive L.S. into her home full-time. In November 2020, Mother began living with her cousin in a one-bedroom apartment. Yet as of one week before the hearing, Mother was still unsure whether her cousin would allow the children to live with them, and Mother told the social worker she wanted to move before reunifying with the children. Although Mother's stipulated testimony was that her cousin had given permission for the children to live with her while she looked for a new home, the juvenile court could have been concerned with Mother's lack of foresight, as she had failed to secure housing

17

for her children as of one week prior to the hearing. Housing insecurity had been a problem for Mother in the past, since she had previously chosen to move with the children into the home of their maternal step-grandfather, despite his alcoholism and history of sexual abuse. Based on this record, it was reasonable for the court to conclude that family maintenance was not a safe option for L.S.

Mother's attempt to analogize to *In re Ashly F.* (2014) 225 Cal.App.4th 803 (*Ashly F.*) is also unpersuasive. There, the mother inflicted physical abuse on two children, of which the father was largely unaware. (*Id.* at p. 806.) The Court of Appeal reversed the dispositional order, concluding there was ample evidence that the children could be protected without removing them from the family home. (*Id.* at pp. 810–811.) The court focused on the mother's remorse and acceptance of responsibility, and that both parents had enrolled and parenting classes. (*Id.* at p. 810.) It concluded that reasonable alternatives to the removal existed, which included removing the mother as the abusive parent from the home. (*Ibid.*)

Unlike *Ashly F.*, where one parent was unaware of the abuse inflicted by the other parent, the juvenile court here determined that given the nature of M.S.'s injuries, Mother should have at least been aware of the abuse. Additionally, given the severity of M.S.'s injuries and Mother's lack of insight into how the injuries occurred, the court was justifiably concerned that L.S. and his sibling faced an ongoing threat of harm if returned to Mother's custody. It identified the facts on which the decision to remove L.S. was based, and substantial evidence supports the finding that alternative measures were not a viable option at the time of the dispositional hearing. (Cf. *Ashly F., supra,* 225 Cal.App.4th at p. 810 [court erred by failing to state the facts supporting its conclusion].)

18

Lastly, any error by the juvenile court in failing to address reasonable alternatives to L.S.'s removal was harmless. As of one week before the dispositional hearing, Mother had failed to make housing arrangements for the children, and she herself expressed anxiety about receiving the children into her home. Mother also needed to develop insight and responsibility for the risks she created to the children's safety. Based on these circumstances, it is not reasonably probable that the court would have concluded there were reasonable alternatives to removal. (*In re D'Anthony D.* (2014) 230 Cal.App.4th 292, 304.)

## DISPOSITION

The juvenile court's orders and findings are affirmed.

DATO, J.

WE CONCUR:

O'ROURKE, Acting P. J.

IRION, J.

19