Filed 8/16/23  In re J.J. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re J.J., a Person Coming Under the Juvenile Court Law. | B322303 (Los Angeles County Super. Ct. No. 19CCJP07550A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. CHARLES J., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Hernan D. Vera, Judge.  Affirmed.

Candice L. Christensen, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, O. Raquel Ramirez, Deputy County Counsel, for Plaintiff and Respondent.

* * * * * *

Charles J. (father) appeals from the juvenile court's findings and orders establishing dependency jurisdiction over J.J. (born December 2005) and the denial of his request to place J.J. in his custody pursuant to Welfare and Institutions Code sections 300 and 362.[1] As substantial evidence supports the findings that father's conduct created a risk to J.J. and placement with father would be detrimental to J.J., we affirm.

## FACTUAL BACKGROUND
### Neglect leading to original section 300 petition

The Los Angeles Department of Children and Family Services (DCFS) received a report on October 30, 2019, alleging general neglect of the child, J.J., by mother, Susan S. (mother),who resided at the Union Rescue Mission homeless shelter.

Mother violated the shelter's policy on October 29, 2019, when she left J.J. alone in their unit. Mother returned hours later and tested positive for marijuana and methamphetamine. This was not her first positive test for illicit substances.

---

[1] All subsequent statutory references are to the Welfare and Institutions Code.

2

Children's social workers (CSW's) unsuccessfully tried to meet with J.J. at her school and with mother and J.J. at the facility. Mother and J.J. had left the shelter.

Previously, mother disclosed father's name to the shelter, noting he was in San Bernardino and she tried to limit contact with him. DCFS later discovered the family had a previous referral for child neglect in December 2005, which included allegations of severe neglect of J.J., who was only a few days old at the time. Mother then reported father frequently smoked in their home and seemingly did not care he was endangering J.J. because he did not want her. Mother soon moved in with J.J.'s maternal grandmother to distance herself from father.

In November 2019, a CSW attempted to contact father at his last known telephone numbers but was only able to leave messages and send a notice of the proceedings to his last known address.

A petition was filed on November 22, 2019, alleging neglect under section 300, subdivision (b), based on mother's substance abuse. The location of mother and J.J. was unknown. A detention hearing was held on November 25, 2019, and a protective warrant for J.J. was issued.

**J.J. found and adjudication hearing**

In July 2020, a CSW discovered J.J. was in Arizona but was unable to obtain any further information because mother declined to provide an address or to cooperate with efforts to determine whether J.J. was safe.

Notices of the proceedings continued to be sent to father's last known address throughout 2021. Father did not respond.

On February 2, 2022, DCFS discovered J.J.'s location from the maternal aunt, who also advised that mother had passed away on December 28, 2021.

J.J. initially stayed with her maternal uncle in Riverside, who provided a CSW with J.J.'s cell phone number. J.J. informed the CSW that she was no longer staying with her uncle because he was residing in his vehicle. She was now staying with a family friend, Rudy R., in San Bernardino.

Rudy R. confirmed he had known both mother and J.J. for years and was willing to provide for J.J.'s basic needs. J.J. viewed Rudy R. as her family and asserted she might run away if she had to reside with her uncle. Upon evaluating Rudy R.'s home, the CSW found it suitable, devoid of any safety concerns. Consequently, DCFS placed J.J. with Rudy R., as an emergency resource family approval placement.

On February 8, 2022, the juvenile court recalled the protective custody for J.J. The court scheduled an adjudication hearing for April 25, 2022.

At the April hearing, DCFS reported it had initiated another due diligence search for father on February 19, 2022. J.J. said she had not seen or spoken with father since she was four or five years old.

**Father's reappearance and investigation into claims of physical abuse**

On March 8, 2022, father provided his contact details to the CSW. He acknowledged having received notice of the juvenile court proceedings and he asserted his desire for full custody of J.J.

DCFS subsequently discovered father had an extensive arrest history linked to domestic violence and drug-related

4

offenses, spanning from 1998 to 2012, and convictions for drug-related offenses in 1999, 2006, and 2009. His most recent arrest was in January 2021 for possessing marijuana with intent to sell.

Father's home was assessed on March 15, 2022, and no child safety issues were found. Father and his girlfriend had been together for 20 years, and the girlfriend supported placing J.J. with father. Father claimed J.J. lived with him until mother took her when J.J. was about 13 years old. He added he had last seen J.J. a year and a half earlier during a visit.

When the CSW reported J.J. claimed not to remember father due to her young age during their last visit, father attributed it to J.J.'s habit of dishonesty. He denied ever physically disciplining J.J. and denied using any drugs or alcohol. Citing a work-related injury, he was unable to travel for a drug test or fingerprinting.

Upon learning J.J. was residing with a gay couple, both father and his girlfriend reacted unfavorably. Father expressly stated his opposition to J.J. living with a gay couple, and the girlfriend also disapproved.

Father was asked to sign a consent form to allow J.J. access to mental health services because she exhibited signs of depression and anxiety following her mother's death. Father refused to sign the form, stating he needed to think about it. Father added J.J. did not need therapy and the only help she needed was to stay with her family.

In March 2022, when J.J. was asked about her father, she said she did not remember anything about father and had no desire to be under his care. J.J. added she was unwilling to visit father, giving as her reason that father had struck her with a belt on one or maybe three occasions. She did not remember why he

hit her with a belt. She recalled mother discovering bruises on J.J.'s body from father hitting J.J. and mother then barring J.J. from seeing father. Contrary to father's claim, J.J. denied seeing him a year and a half earlier. J.J. threatened to run away if she were removed from Rudy R. and placed with her father.

When reinterviewed about her father on April 19, 2022, J.J. continued to assert her unwillingness to speak or visit with father. She described their last encounter as "bad," without elaborating on the details or when it occurred. When asked about calling father while she was with her school counselor, she rejected the idea and expressed frustration about being forced into interacting with him. J.J. recalled living with father during her 5th grade year when he hit her with a belt on her back because she ate something without permission. She repeated that father had hit her on three occasions, and her mother did not let her live with father after mother saw the bruises on J.J.'s back. J.J. also recalled witnessing father frequently fighting with his girlfriend. She reported father would punch his girlfriend in the face and throw her around the room. J.J. recalled a specific incident when father threw his girlfriend into a bookshelf in front of J.J. and also disclosed father smoked "a lot" of cannabis daily outside the home. Describing her father as intimidating, J.J. did not feel safe and felt "weird" around him.

When these disclosures were made to father on April 19, 2022, father denied them. He dismissed J.J.'s claims as false with "the little girl is lying to you." When questioned about his use of corporal punishment, he said: "But, if she did get a whoopin' maybe it was because she was doing something she wasn't supposed to do. If I have, she was out of line and doing something she shouldn't be doing. I've never hit her with an open hand,

closed first, or anything like that." When asked to elaborate on what this punishment entailed and when it occurred, father responded, "I can't tell you if I have or if I haven't." He repeated that if she did get punished, it was because she was doing something she should not have been doing.

When father was asked when J.J. was in his care, he claimed it was at different ages because mother would leave J.J. with him for years and then take her again. He also denied any intimate partner violence between him and his girlfriend.

When asked about his decision to withhold consent for J.J. to receive mental health services, father repeated his belief he could adequately care for her needs himself. Father also confirmed his discomfort regarding J.J.'s living with a same-sex couple, expressing his personal opinion that it did not feel right.

**Adjudication hearing and first amended petition**

On April 25, 2022, father participated in the adjudication hearing via Webex. The court found it would be harmful to place J.J. with her noncustodial father, citing three factors: (1) the allegations father physically abused J.J. in the past; (2) father's refusal to authorize mental health services for J.J.; and (3) J.J.'s expressed intent to run away if returned to father's care, indicating father's potential inability to provide for her. The court ordered DCFS to facilitate contact between J.J. and father and to arrange individual counseling and mental health services for J.J.

At the continued hearing on May 19, 2022, a first amended petition was filed, alleging father physically abused J.J. by striking and bruising her back with a belt on at least three occasions.

In May 2022, J.J. consented to monthly meetings with father, which resulted in a visit with father and his girlfriend at a

park. J.J. reported a favorable response to the meeting and indicated a level of comfort with father's girlfriend, recalling the girlfriend had been her caregiver years before when J.J. lived with father. J.J., however, expressed satisfaction with her current living arrangement because they were good role models who did not smoke cannabis before work, did not drink or smoke, and lived a healthy lifestyle.

On May 26, 2022, the juvenile court dismissed the original section 300 petition after the first amended petition was filed. Additionally, the court ordered J.J. to be detained from father.

**Adjudication and disposition hearings**

The juvenile court conducted the combined jurisdiction and disposition hearing on July 18, 2022, admitting DCFS's exhibits without objection.

DCFS reported father had agreed to J.J. receiving mental health services but had yet to return the necessary consent form. In addition, father had canceled his scheduled monthly visit with J.J. for June.

Father admitted he had not seen J.J. for five or six years before their May 2022 visit. He clarified J.J. resided with him when she was about nine or 10 years old. He acknowledged employing verbal discipline but denied using physical punishment with J.J. He conceded that a "whupping" could involve using a belt but denied he had ever used one on J.J. or struck her with his hand. He expressed his view that their visit in May had been positive.

Contrary to father's account, J.J. testified that father had attempted to strike her with a belt on one occasion and then struck her with a belt on two other occasions. The first time occurred due to her lying or adopting a defiant attitude. He used

the belt the second time as punishment for eating something off-limits and lying about it. The third incident also involved a belt, resulting in bruises across her back as punishment for lying. J.J. also testified she had seen father hit both his girlfriend and J.J.'s uncle. While she did not express fear of her father, J.J. repeated she would run away if required to live with him.

The court found J.J.'s testimony credible and consistent with her prior statements. It sustained count a-1 (physical abuse) and dismissed as duplicative count b-1 (neglect) in the petition.

The court then ordered J.J.'s removal from father "based on the dependency court removal order set forth in the minute order" that specified the court found, by clear and convincing evidence, that J.J.'s return to father would be detrimental, and there was a substantial risk of harm to J.J. should she be returned to father.

The court ordered reunification services for father, including joint counseling with J.J. and parenting education. Further, the court ordered monitored visits for father with J.J. and that father and Rudy R. would have a joint right to make educational decisions for J.J. Finally, the court scheduled a progress hearing to assess if different orders might be appropriate.

Father filed a timely notice of appeal.

## DISCUSSION

### I.    Jurisdictional finding

Father contends that his alleged corporal punishment of J.J. is not sufficient to support the jurisdictional finding made pursuant to section 300, subdivision (a).

9

## A. *Applicable law and standard of review*

Section 300, subdivision (a) provides in relevant part: "A child who comes within any of the following descriptions is within the jurisdiction of the juvenile court . . . [¶] (a) The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian."

"If the court finds that the child is a person described by Section 300, it may order and adjudge the child to be a dependent child of the court." (§ 360, subd. (d).) "'The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child.'" (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

In reviewing the jurisdictional findings and the disposition, we look to see if substantial evidence, contradicted or uncontradicted, supports them. (*In re Tania S.* (1992) 5 Cal.App.4th 728, 733.) Under this standard, we must view the evidence in the light most favorable to the juvenile court's order, drawing every reasonable inference in support of the judgment. (*In re Marina S.* (2005) 132 Cal.App.4th 158, 165.) We do not reweigh the evidence. (*Ibid.*)

It is father, as the appellant, who bears the burden to show that insufficient evidence supports the jurisdictional findings. (*In re I.J., supra*, 56 Cal.4th at p. 773.)

## B. *Substantial evidence supports the jurisdictional finding*

Father contends his use of a belt on three occasions to discipline J.J. occurred years ago and is not substantial evidence of physical abuse. But he does not address several other pieces of

evidence showing his conduct created a substantial risk that J.J. would suffer serious physical harm from father.

First, the bruising from father's third use of a belt on J.J.'s back was sufficiently severe that mother refused to allow J.J. to visit father after that. This was not an isolated incident because father tried or used the belt on three occasions.

Additionally, father denied the physical abuse and made evasive statements such as "I can't tell you if I have or if I haven't. If she did get a whoopin', it's because she did something that she wasn't supposed to have been doing." When he specified the types of physical punishment he had not done, he did not include the use of a belt: "I've never hit her with an open hand, a closed fist, or anything like that." Father's denial and evasive responses on questions about his use of physical punishment are a refusal to acknowledge the problem of inflicting serious physical harm when he was disciplining J.J. It is reasonable to draw an inference from his refusal to acknowledge that a risk of physical harm remained. (*In re A.J.* (2011) 197 Cal.App.4th 1095, 1106 [parent's refusal to acknowledge responsibility is relevant in assessing risk at the jurisdictional stage].)

Second, J.J. stated she had seen father punch his girlfriend in the face and throw her into a bookshelf right in front of J.J. This exposure to father's domestic violence placed J.J. at substantial risk of serious physical harm because she was present and in close proximity to violence between father and his partner. This is an additional ground on which to find section 300, subdivision (a), appropriate. (*In re Giovanni F.* (2010) 184 Cal.App.4th 594, 599 [domestic violence is nonaccidental and any harm suffered would result from nonaccidental conduct].)

11

Third, it is reasonable to draw an inference from father's conduct that he uses violence to secure compliance. Although father was last violent with J.J. in 2016, this is likely due to mother prohibiting visits with him. There is no evidence father stopped using violence since 2016 and, coupled with father's denial he ever engaged in physical violence, there is no indication he has learned techniques to avoid resorting to violence. Therefore, there is no guarantee these violent acts against J.J. were isolated events that would never happen again.

It is the purpose of section 300 to provide maximum safety and protection for children from acts or omissions that place them at a substantial risk of suffering serious physical harm. (*In re M.M.* (2015) 240 Cal.App.4th 703, 720.) This record contains substantial evidence that jurisdiction was appropriate to protect J.J. from a substantial risk of suffering serious physical harm from father, who had previously engaged in physical violence directed at J.J., against his partner in the immediate presence of J.J., and who denied such violence against J.J. or his partner.

### C.     *Inclusion in Child Abuse Central Index*

Father contends that he is at risk of inclusion in the Child Abuse Central Index, and it may adversely affect his future employment or volunteer opportunities. Since he failed to cite any part of the record showing he raised this contention in the trial court, it is forfeited on appeal. (*Baxter v. State Teachers' Retirement System* (2017) 18 Cal.App.5th 340, 378 [a party may be deemed to waive a claim of error either by affirmative conduct or by failure to take proper steps in the trial court to avoid or cure the error].)

Father cites *Chapman v. California* (1967) 386 U.S. 18 to argue that the court's ruling was not harmless beyond a

12

reasonable doubt. In *Chapman*, the United States Supreme Court established the "harmless error" test as a standard for determining whether constitutional errors during a criminal trial can be deemed harmless and not require reversal of the conviction. This is not a criminal trial, and there is no conviction to reverse. Substantial evidence supports the juvenile court's jurisdiction over J.J. based on a showing J.J. suffered physical abuse due to her father striking her so severely that she bruised and due to father punching and throwing his girlfriend into a bookcase in front of J.J. Father had the opportunity to appear and testify at the hearing. He cites no legal authority showing that the juvenile court committed constitutional error when it made its findings without considering the risk of father being included in the Child Abuse Central Index.

## II.    Removal Order

Father also challenges the juvenile court's disposition order removing J.J. from his custody pursuant to section 361.

### A.    *Applicable law and standard of review*

Section 361, subdivision (c), states that "[a] dependent child shall not be taken from the physical custody of his or her parents . . . with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence" of "a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor" and "no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." A juvenile court's dispositional order removing a child from a parent's custody is reviewed for substantial evidence. (*In re Hailey T*. (2012) 212 Cal.App.4th 139,

13

146-147.) In doing so, we must bear in mind the heightened burden of proof. (*In re A.E.* (2014) 228 Cal.App.4th 820, 826.)

**B.     *Father was a noncustodial parent***

Section 361 is inapplicable here as it only authorizes a child's removal "'from the physical custody of his or her parents or guardian or guardians *with whom the child resides* at the time the petition was initiated.'" (*In re Dakota J.* (2015) 242 Cal.App.4th 619, 628.) Father did not have physical custody of J.J. when either the original or amended petition was filed. J.J. was residing with mother at the time of the original petition and then with her uncle or Rudy R. at the time the amended petition was filed. The court did not order the removal of J.J. from the physical custody of father. Therefore, father's contention that the removal order violated section 361 is of no moment.

"We are not bound to develop appellants' arguments for them. [Citation.] The absence of cogent legal argument or citation to authority allows this court to treat the contentions as waived." (*In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 830.)

**C.     *Substantial evidence supported the order denying placement with father***

Section 361.2 provides that the juvenile court shall place the child with the noncustodial parent if that parent requests it unless the court finds the placement would be detrimental. (*In re Janee W.* (2006) 140 Cal.App.4th 1444, 1451.) A court's ruling under section 361.2, subdivision (a), that a child should not be placed with a previously noncustodial parent requires a finding of detriment by clear and convincing evidence. (*In re Luke M.* (2003) 107 Cal.App.4th 1412, 1426.) The court must weigh all relevant factors in making such a finding. (*Id.* at pp. 1422-1423, 1425.)

14

The absence of a relationship between a father and a daughter, as well as the daughter's wishes, are relevant factors to a detriment determination. (*In re A.C.* (2020) 54 Cal.App.5th 38, 43.) Additionally, impairment of a child's emotional well-being may supersede placement with a previously noncustodial parent. (*Id.* at p. 46.)

A juvenile court's findings and orders under section 361.2 are reviewed for substantial evidence. (*In re K.B.* (2015) 239 Cal.App.4th 972, 979.) "When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011.)

Here, the record shows J.J. had little to no relationship with father and she did not want to be placed with him, threatening to run away. Also father had not signed the consent form for mental health services, thus impairing J.J.'s emotional well-being. Additionally, the court found J.J. credible when she testified father had physically abused her so severely that mother prohibited further visits, and father had physically abused his partner in the immediate presence of J.J. Father denied the violence and offered no evidence this behavior was no longer likely. Thus, the record contains evidence showing it highly probable that the violence occurred and would occur again if J.J. were placed with father. Certainly supplying substantial evidence of detriment.

## DISPOSITION

The juvenile court's jurisdictional and removal orders are affirmed.

_____

CHAVEZ, J.

We concur:

_____

LUI, P. J.

_____

HOFFSTADT, J.