Filed 11/23/15

*CERTIFIED FOR PUBLICATION*


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE


| | |
|---|---|
| In re DAKOTA J., et al., Persons Coming Under the Juvenile Court Law. | B264460 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. CK74743) |
| Plaintiff and Respondent, | |
| v. | |
| STACEY J., | |
| Defendant and Appellant. | |


APPEAL from an order of the Superior Court of Los Angeles County, Teresa Sullivan, Judge. Reversed.

Valerie N. Lankford, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the County Counsel, Mary C. Wickham, Interim County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Navid Nakhjavani, Deputy County Counsel, for Plaintiff and Respondent.

―――――――――――――――

## INTRODUCTION

Appellant Stacey J. (mother) appeals the juvenile court's dispositional order removing her sons, Dakota and Joseph, from her physical custody and ordering suitable placement. Mother contends the court erred by removing the boys under Welfare & Institutions Code section 361, subdivision (c), because the boys were not in her physical custody at the time the Department filed its petition, and had not been in her custody for several years prior.[1] Mother also argues, in the alternative, that no substantial evidence supports the removal order, and that the court should have considered noncustodial placement under section 361.2, subdivision (a), rather than removal under section 361, subdivision (c). We agree with mother's first argument and reverse.

## FACTS AND PROCEDURAL BACKGROUND

Mother has three children, Dakota (age 18)[2], Joseph (age 15) and Faith (age 10). All three children were the subject of a prior juvenile dependency proceeding initiated in 2008. In connection with that proceeding, mother was awarded legal and physical custody of Dakota and Joseph in 2010.[3] However, for the past six or seven years, the boys lived with their father's step-father, Michael Y, and saw mother only for a few hours each week.[4] Faith continued to reside with mother.

In October 2014, the Department of Children and Family Services (Department) received an anonymous referral regarding Faith. In response to the referral, a Department social worker attempted to visit mother and Faith at the hotel where they were living. Mother refused to open the door to her hotel room or to speak with the

---

[1]    All further statutory section references are to the Welfare & Institutions Code.

[2]    Dakota was 17 years old at the time the petition was filed.

[3]    The detention report states that mother was granted sole physical, but joint legal custody with the boys' father. However, the jurisdiction/disposition report states that mother had sole legal custody.

[4]    Although the Department included allegations regarding the boys' father in the current petition, he is not a party to this appeal. Accordingly, we do not discuss the allegations and facts pertinent only to him.

2

social worker. A few days later, another social worker attempted to visit mother at the hotel. Although mother initially opened the door to her room, when she learned the social worker was from the Department, she responded with profanity and threats of violence, then slammed the door. At the social worker's request, officers from the Inglewood Police Department came to the hotel to assist with the Department's investigation. Mother refused to open her hotel room door, and would not comply with the officers' verbal request to allow the social worker to see Faith and assess her condition. After the officers learned that there were outstanding warrants against mother, they obtained a key from the hotel attendant and opened the hotel room door. The officers entered the hotel room and observed Faith sitting on the bed. Mother said to the officers, " 'I have a right to kill you here because I don't like cops. I have a right to murder you here now that you are inside my home.' " Mother attempted to strike the officers and, after a brief struggle, one of the officers used a Taser to subdue her. Mother was subsequently hospitalized with a broken arm.

With mother's consent, the Department placed Faith temporarily with a family friend, Dorothy W., while mother was in the hospital. During an initial interview, Faith told the social worker she was nine years old but did not go to school. Faith said she left the hotel room only occasionally, when she would go with her mother to buy cigarettes. Faith also disclosed that mother smoked cigarettes and "other stuff."

The Department conducted a comprehensive investigation of the family over the next several weeks. After mother was discharged from the hospital, a social worker visited mother and Faith at Dorothy's home. Mother appeared frustrated by the investigation and denied neglecting Faith. Mother initially refused to answer the social worker's questions, stating " 'you guys are in the process of me being in the Cold War. It's international elite conspiracy. I don't need to answer you.' " Mother later explained to the social worker that she had a microchip implanted in the left side of her neck behind her left ear to protect her. Mother stated she "did not abuse the power of the microchip even though she could have used it to find out classified information . . . . "

3

Mother became increasingly agitated during the interview at Dorothy's house and asked the social worker if Dorothy could join them. When the social worker stated the interview was intended to be confidential, mother responded, " '[t]here is nothing confidential with me because I am sure the people at pentagon [sic.] are listening through the microchip.' " Mother also said the microchip implanted in her head sent her visual images, and the people watching her were " 'mixed people who were alien species that look like people,' " and were " 'everywhere.' " Mother stated she taught Faith how to identify the aliens because most people cannot recognize them and they can come through the television. She told the social worker she had been seeing white flies flying all over her recently, and also explained that the moon is a holographic satellite.

With regard to Faith, mother confirmed she was being homeschooled, but acknowledged the homeschooling was not being overseen by any educational entity. Although mother denied taking Faith to beg for money, she admitted that they "go out to do 'freedom of speech stuff' which is asking for money." Mother claimed Faith had been receiving regular medical care, but refused to provide the name of any physician who had ever treated Faith. Mother also acknowledged that Faith did not receive immunizations because "they are poisonous," and did not see a dentist because dentists are " 'scandalous and the fluoride in the toothpaste is poisonous.' " As to Dakota and Joseph, mother confirmed their father was in jail and the boys were living with Michael Y.

After meeting with mother, the social worker interviewed Faith, who confirmed many of the details mother provided. Faith disclosed she had seen her mother smoke cigarettes "and something that looked like little white stone and wood color looking wrapper," and that mother had a pipe and would sometimes put flowers in the pipe and smoke.

A few weeks after the interview at Dorothy's house, the social worker called mother to confirm that she would be taking Faith to get a medical examination. Mother said the hospital had contacted her to schedule an appointment. However, mother

responded, " 'I don't have to do anything that you guys said and I am not taking her to Harbor UCLA. Those government hospitals are where they implant microchip in people. I think you are working with the Zulus and you seem to be an agent.' " Mother abruptly ended the phone call and the Department's further efforts to contact her were unsuccessful.

The Department also interviewed Dakota and Joseph.[5] Dakota told the social worker he and Joseph lived with mother until he was 12 or 13 years old, at which time mother was evicted from her home. Dakota and Joseph had been living with Michael Y. since that time. Dakota stated he was attending continuation school, rather than high school. He explained that during 10th and 11th grades he didn't do his homework and, as a result, fell behind in school. Although Dakota initially said mother was "mentally fine," he later said " 'she believes that there are too many conspiracies about the Government and that the moon is a hologram. She just says things that I cannot understand, at times.' " Dakota remembered mother participated in a drug rehabilitation program when he was four years old in order to treat her crack cocaine addiction and denied mother was currently using drugs.

Joseph said he believed mother " 'is a good mom, but can be overprotective.' " He expressed concern for mother's mental health, stating " 'I am worried about her paranoia, because she believes there are problems with the world and that someone could break into the house to kill us or hurt us.' " Joseph confirmed he was having difficulty in school but was trying to schedule time to do his homework. He described Michael Y. as " 'a nice guy,' " and said Michael provided food for the boys, transported them as needed, and washed their laundry for them. Joseph confirmed he felt safe with Michael Y. and at his home.

---

[5] The Department interviewed Michael Y. as well, and included a number of statements attributed to him in its jurisdiction/disposition report. However, because the court sustained mother's objection on hearsay grounds, Michael Y.'s statements have not been considered by this court.

On November 18, 2014, the Department filed a juvenile dependency petition under section 300, subdivision (b), seeking jurisdiction over all three children. The Department alleged mother was unable to provide regular care and supervision of the children due to her mental health condition; specifically, mother appeared to suffer from delusions, visual hallucinations and paranoid behaviors. Mother denied the allegations of the petition. The court detained all three children and ordered mother's visitation to be supervised. The court also ordered mother to submit to random drug testing as well as a mental health and dual diagnosis assessment.

The Department attempted to contact mother in December 2014 regarding the petition. Mother stated she would not talk with the social worker without her attorney present. The Department repeatedly attempted to contact both mother and her attorney, without success. The Department also interviewed the children again. Dakota said that although mother believed in conspiracies, it did not affect her ability to parent the children. He said he had heard his mother talk about the microchip in her head and her belief that she was being watched through the television, but said, " 'I don't pay attention to it. I feel safe with my mom. I've never felt threatened by my mom in any way.' " Joseph responded in a similar fashion. Faith told the social worker that " 'Mommy believes there are aliens in the TV. Mommy don't like fluoride she says its poison. We use water to brush our teeth.' "

The Department filed an amended petition on January 29, 2015, adding an allegation that mother was unable to care for her children due to chronic use of marijuana and cocaine. According to the Department's last minute information dated March 9, 2015, mother submitted to seven drug tests between November 18, 2014 and February 27, 2015. Mother tested positive for opiates (codeine, morphine, and/or hydrocodone) on four occasions and failed to appear on one occasion. She tested negative for all drugs on one occasion, but also tested positive for cocaine on another occasion. In response to the positive drug tests, mother told the Department she was taking prescription pain medication, but she initially failed to provide the Department with copies or any other evidence of the prescriptions. However, mother later

6

photographed the prescription bottles and provided the photos to the Department. Mother also stated on March 31, 2015, that she would not continue to submit to drug tests or follow the other court directives because "she feels that the drug testing site lied and that they are setting her up." Her counsel later represented that mother "believes that the positive test [for cocaine] on January 31st was tampered with by Pacific Toxicology and/or somebody associated with Pacific Toxicology."

The court held an adjudication hearing on April 13, 2015. The court found true both allegations regarding mother and found jurisdiction with respect to all three children under section 300, subdivision (b). With respect to the disposition, the court declared all three children to be dependents of the court and then found, by clear and convincing evidence, that there would be a substantial danger to the children's physical health, safety, protection, physical and emotional well-being if they were returned to mother. Accordingly, the court issued an order removing all three children from mother and ordering suitable placement.

Mother timely appeals.

### DISCUSSION

This case presents the following issue for our consideration: Where clear and convincing evidence supports removal of one child from a parent's physical custody, may a juvenile court also order removal of the parent's other children, when those children are not living with that parent at the relevant time? We conclude the court may not do so because, as mother argues, the Legislature has only authorized removal of a child from the physical custody of the parent(s) "*with whom the child resides at the time the petition was initiated.*" (§ 361, subd. (c), emphasis added.)

Although we usually review dispositional orders for substantial evidence, because the issue in this case involves the interpretation and application of a statute, our review is de novo. (*In re D'Anthony D.* (2014) 230 Cal.App.4th 292, 298.)

1.      *The Court Erred By Applying the Removal Statute to Dakota and Joseph*

Section 361, subdivision (c)(1), provides in relevant part: "A dependent child shall not be taken from the physical custody of his or her parents or guardian or

guardians with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence . . . . [¶] [t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's or guardian's physical custody." (§ 361, subd. (c).) Mother's primary contention on appeal is that section 361, subdivision (c), does not apply to Dakota and Joseph because the boys were not in her physical custody: It was undisputed the boys had been living with their step-grandfather for at least five years before the Department filed its petition in this case. We agree.

In construing a statute, our role is to ascertain the Legislature's intent so that we may effectuate the purpose of the law. (*In re J. W.* (2002) 29 Cal.4th 200, 209.) We consider the words of the statute first, because they are normally the most reliable indicator of legislative intent. (*Ibid.*) Where, as here, the statutory language is unambiguous, the plain meaning controls. (See, e.g., *In re D'Anthony D., supra*, 230 Cal.App.4th at p. 298.)

Section 361, subdivision (c), authorizes a child's removal "from the physical custody of his or her parents or guardian or guardians *with whom the child resides* at the time the petition was initiated." (§ 361, subd. (c), emphasis added.) Although we found no published case in the juvenile dependency context addressing the meaning of "resides" as it is used in this section, historically the term "resides" has been commonly used and understood to mean "to dwell permanently or for a considerable amount of time." (*Leroux v. Industrial Acc. Commission of Cal.* (1934) 140 Cal.App. 569, 573; see also Merriam-Webster's Collegiate Dictionary (10th ed. 2001) p. 993, col. 1 [reside: "to dwell permanently or continuously"].) Applying this definition, it is plain

that the statute does not contemplate that a child could be removed from a parent who is not living with the child at the relevant time.[6]

Our interpretation of the statute is internally consistent. For instance, section 361, subdivision (c)(1), also provides that where a child under the age of five has been declared a dependent of the court due to severe physical abuse by the parent or other adult known to the parent, the court must "consider, as a reasonable means to protect the minor, each of the following: (A) The option of removing an offending parent or guardian from the home. (B) Allowing a nonoffending parent or guardian to retain physical custody as long as that parent or guardian presents a plan acceptable to the court demonstrating that he or she will be able to protect the child from future harm." (§ 361, subd. (c)(1).) These provisions reflect the statute's focus on removal as a means of addressing abuse and neglect originating from the child's home environment in particular.

Our interpretation is also compatible with the considerable body of case law emphasizing that one of the major goals of the dependency system is to preserve the family unit. "The governing statute, section 361, subdivision (c), is clear and specific: Even though children may be dependents of the juvenile court, they shall not be removed from the home in which they are residing at the time of the petition unless there is clear and convincing evidence of a substantial danger to the child's physical health, safety, protection, or physical or emotional well-being *and* there are no

---

[6] The statute enumerates one, and only one, situation in which a court may order removal from a parent with whom the child does not reside. Section 361, subdivision (c)(5), authorizes the court to issue a removal order in the limited circumstance where "[t]he minor has been left without any provision for his or her support, or a parent who has been incarcerated or institutionalized cannot arrange for the care of the minor, or a relative or other adult custodian with whom the child has been left by the parent is unwilling or unable to provide care or support for the child and the whereabouts of the parent is unknown and reasonable efforts to locate him or her have been unsuccessful." (§ 361, subd. (c)(5).) In this case, the court did not order removal under this subsection. We decline to extend this exception beyond its express terms to include the present situation, which does not involve incarceration, institutionalization, or the total abandonment described in subdivision (c)(5).

9

'reasonable means' by which the child can be protectedwithout removal. [Citation.] The statute embodies 'an effort to shift the emphasis of the child dependency laws to maintaining children in their natural parent's homes where it was safe to do so.' [Citations.]" (*In re Jasmine G.* (2000) 82 Cal.App.4th 282, 288.) In that context, courts have consistently held that removal "is a last resort, to be considered only when the child would be in danger if allowed to reside with the parent." (*In re Henry V.* (2004) 119 Cal.App.4th 522, 525.)

We are aware that mother was given legal custody of the boys in 2010, in connection with a prior dependency proceeding. However, given the plain meaning of the statute and a common sense interpretation of the phrase "parent [] . . . with whom the child resides," we conclude the statute does not authorize an order of removal from *every* parent having legal custody rights, even those who do not currently reside with their children. Rather, as we have concluded, the Legislature chose to authorize removal only from a parent who is residing with his or her child. (Cf. *In re Isayah C.* (2004) 118 Cal.App.4th 684, 700 ["[A] parent may have custody of a child, in a legal sense, even while delegating the day-to-day care of that child to a third party for a limited period of time."]) Courts considering temporary placement following removal are in agreement with our approach. For example, the court of appeal in *In re Abram L.* (2013) 219 Cal.App.4th 452, concluded a juvenile court order removing two children from their mother was supported by substantial evidence. The court reversed the removal order as to father and observed the children "could not be removed from *father's* physical custody under section 361, subdivision (c)(1) because they were not residing with him when the petition was initiated." (*Id*. at p. 460.) The court held that following the removal of the children from their mother, the juvenile court should have considered whether to place the children with their noncustodial father under section 361.2, subdivision (a). (*Id.*; see also *In re V.F*. (2007) 157 Cal.App.4th 962, 969 [noting § 361, subdivision (c), "does not, by its terms, encompass the situation of the noncustodial parent"].)

10

We conclude the court erred by ordering Dakota and Joseph removed from mother's physical custody under section 361, subdivision (c), because they were not residing with mother when the Department initiated the petition and had not been residing with her for at least five years. Accordingly, we need not address mother's contention that the removal order is not supported by substantial evidence. In addition, we do not address the parties' arguments relating to the applicability of section 361.2, because that statute governs placement of a child after the court issues a valid removal order. (§ 361.2; see *In re Marquis D.* (1995) 38 Cal.App.4th 1813, 1820 ["Section 361.2 establishes the procedures a court must follow for placing a dependent child following removal from the custodial parent pursuant to section 361."].)

Finally, we reject the Department's contention that mother forfeited her arguments on appeal by failing to object below. First, at the dispositional hearing, mother objected "to the court making any dispositional orders as it is her position that there was no basis for such orders." We read this statement to include an objection to removal because the Department made clear in its jurisdictional/dispositional report that it was seeking to remove all three children under section 361, subdivision (c). Second, it was undisputed throughout the proceedings below that the boys were not residing with mother, as their counsel pointed out to the court at the hearing. On this record, the applicability of section 361, subdivision (c), is a question of law which we would exercise our discretion to address in any event. (See, e.g., *In re Jonathan P*. (2014) 226 Cal.App.4th 1240, 1252 [finding father did not forfeit appellate review of whether the juvenile court failed to apply or comply with § 361.2 because the arguments raised by father were primarily issues of law]; *In re Abram L., supra,* 219 Cal.App.4th at p. 462 [same].)

2.    *The Court's Error Was Not Harmless*

We cannot reverse the court's judgment unless its error was prejudicial, i.e., it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error. (See, e.g., *In re Abram L., supra,* 219 Cal.App.4th at p. 463.) In this case, the prejudice from the court's removal order is manifest.

11

"A parent's right to care, custody and management of a child is a fundamental liberty interest protected by the federal Constitution that will not be disturbed except in extreme cases where a parent acts in a manner incompatible with parenthood. [Citations.]" (*In re Marquis D., supra*, 38 Cal.App.4th p. 1828.) "[F]reedom of personal choice in matters of family life is a fundamental liberty interest protected by the Fourteenth Amendment. [Citations.]" (*Santosky v. Kramer* (1982) 455 U.S. 745, 753 (*Santosky*); *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 251.) Thus, the constitutional right of parents to make decisions regarding their children's upbringing precludes the state from intervening, in the absence of clear and convincing evidence of a need to protect the child from severe neglect or physical abuse. (*Santosky, supra,* at pp. 769–770; *Marquis D., supra*, at pp. 1828–1829.)

Our Legislature has acknowledged the gravity of a removal order. Before a court may order a child physically removed from his or her parents, it must find, by clear and convincing evidence, the child would be at substantial risk of harm if returned home and there are no reasonable means by which the child can be protected without removal. (§ 361, subd. (c)(1); *Cynthia D., supra,* 5 Cal.4th at p. 248.) This is a heightened standard of proof, as compared to the preponderance of the evidence standard necessary to find jurisdiction over a child. (Compare § 355, subd. (a) [jurisdiction must be established by preponderance of the evidence] with § 361, subd. (c) [removal authorized only upon clear and convincing evidence of risk of substantial harm]; see also *In re Henry V., supra*, 119 Cal.App.4th at p. 528 [noting that "the burden of proof is substantially greater at the dispositional phase than it is at the jurisdictional phase if the minor is to be removed from his or her home"].) "Removal on any ground not involving parental rejection, abandonment, or institutionalization requires a finding that there are no reasonable means of protecting the child without depriving the parent of custody. (§ 361, subd. (c); see *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 253.)" (*Id*. at p. 525.)

The heightened standard of proof is crucial, and necessary to provide due process, because "[a] dispositional order removing a child from a parent's custody is

12

'a critical firebreak in California's juvenile dependency system' [citation], after which a series of findings by a preponderance of the evidence may result in termination of parental rights." (*In re Henry V., supra*, 119 Cal.App.4th at p. 530.) Further, the issuance of a removal order triggers the provision (or denial) of reunification services and starts the clock running on reunification efforts. (See §§ 361.5 [reunification services]; 366 [status review]; 366.21 [review hearings]; 366.22 [18 month permanency review].) Specifically, "[a]t the 12-month review, if the court does not return the child and finds that there is no substantial probability of return to the parent within 18 months of the original removal order, the court must terminate reunification efforts and set the matter for a hearing pursuant to section 366.26 for the selection and implementation of a permanent plan. (§ 366.21, subd. (g).) Even then, the court must determine by clear and convincing evidence that reasonable reunification services have been provided or offered to the parents. (§ 366.21, subd. (g)(1).) If the child is not returned to the parents at the 18-month review, the court must set the matter for a section 366.26 hearing [to terminate parental rights]." (*Cynthia D., supra*, 5 Cal.4th at p. 249.)

Although there is ample evidence in the record concerning mother's current inability to care for her children, we also acknowledge that mother recognized her situation and made arrangements for her boys to live with a relative who has cared for them and provided them with a stable home. Imposing a removal order in that instance is not only contrary to the plain language of the statute but is also punitive.

In addition, while it may often be the case that where removal of one child is necessary, removal of all children in the family also is necessary, that will not always be the case. (See, e.g., *In re Hailey T.* (2012) 212 Cal.App.4th 139, 147-148 [reversing removal order because fact of infant's injury did not constitute clear and convincing evidence of a substantial risk of harm to older sibling].) That is, where more than one child is the subject of a dependency proceeding, the juvenile court must analyze each child's circumstances independently at the dispositional stage. Although there is overwhelming evidence to support the removal order as to Faith, Dakota and Joseph

13

have been well cared for and felt safe while with Michael Y. in his home for more than five years.  The Department does not argue otherwise.

## *DISPOSITION*

The portion of the court's dispositional order removing Dakota and Joseph from mother's physical custody under section 361, subdivision (c)(1), is reversed.

Although we reverse the dispositional order because it is based on an improper application of section 361, subdivision (c), nothing in this opinion should be construed to restrict the court's authority on remand to make a new dispositional order applying any applicable statute or rule.  We note, for example, section 361, subdivision (a)(1), allows the court to "limit the control to be exercised over the dependent child by any parent or guardian . . . . " (§ 361, subd. (a)(1).)  Unlike section 361, subdivision (c), section 361, subdivision (a), applies to "*any* parent or guardian," not solely custodial parents or guardians.  Similarly, section 362, subdivision (a), further authorizes the court to "make any and all reasonable orders for the care, supervision, custody, conduct, maintenance, and support of the child . . . . " (§ 362, subd. (a).)  We leave the specific provisions of the new dispositional order to the court's sound discretion.


**CERTIFIED FOR PUBLICATION**


LAVIN, J.

WE CONCUR:


ALDRICH, Acting P. J.                    JONES, J.*

---

Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.