Filed 2/21/24  In re O.B. CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| In re O.B., a Person Coming Under the Juvenile Court Law. | 2d Juv. No. B325600 (Super. Ct. No. 22JD-00260-001) (San Luis Obispo County) |
| SAN LUIS OBISPO COUNTY DEPARTMENT OF SOCIAL SERVICES,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>L.M. et al.,<br><br>    Defendant and Appellant. | |

L.M. (Father) appeals an order of the juvenile court finding jurisdiction over his child pursuant to Welfare and Institutions

Code[1] section 300, subdivision (b)(1), and depriving Father of custody under section 361.2, subdivision (a).  We affirm.

FACTS

*Background*

E.C. (Mother) and Father had a brief relationship in 2020.  O.B. was born in August 2021.  Father is not on O.B.'s birth certificate.  Father and Mother were not residing together at the time of O.B.'s birth or thereafter.

In August 2021, Mother obtained a domestic violence restraining order against Father from family law court.  The order required Father to stay at least 100 yards from Mother.  Mother's declaration in support of the order stated that while she was seven months pregnant with O.B., Father punched in a window of the trailer she was living in and tried to pull her out of the window, causing bruising to her arms.

Thereafter Father filed an action in family law court for custody of O.B.  The court made no finding of paternity, but ordered Father pay child support to Mother.  The court awarded Father supervised visitation with O.B.

In August 2022, Mother filed for temporary restraining order (TRO) against Father.  The hearing was pending when the San Luis Obispo County Department of Social Services (DSS) filed the petition in this case.

*Altercation*

On September 11, 2022, DSS received a report that in the early morning hours on that date, Mother, and her then boyfriend engaged in a physical altercation in front of O.B.  Mother bit her boyfriend numerous times and wrestled him to the ground.  Her

---

[1] All statutory references are to the Welfare and Institutions Code.

boyfriend reported that there had been at least three other altercations between them in recent months.

Shortly after the altercation Mother called Father and asked him to meet her at a gas station. When Father arrived, Mother told him about the altercation. She had O.B. with her in the car. Mother drove away because Father became erratic. Father followed her and repeatedly swerved in front of her car to get her to stop. Father called the police who arrested Mother. Father falsely told the police that he had joint legal custody of O.B. The police let him take O.B.

On the day Mother was released from custody, she went to Father's home to pick up O.B. Father called the police. Mother told the police that she had sole legal custody of O.B. and Father had only supervised visitation. The police let Mother take O.B. and Mother returned to her home with her boyfriend.

*Investigation*

On September 13, 2022, a DSS social worker met with Mother and O.B. at Mother's home. O.B. appeared underweight and small with thin legs but did not appear emaciated. Mother reported that Father drives around the neighborhood screaming and crying and follows her home. She also informed the social worker that Father sends messages to her in violation of the restraining order. When Mother filed a subsequent request for a TRO, she attached as exhibits multiple pages of numerous emails and texts Father sent to her over a period of a few months.

DSS told Mother of its intent to remove O.B. from her care due to alleged domestic violence. O.B. could not be placed with Father because he had only supervised visits. DSS said it was seeking a warrant to remove O.B. and place her under DSS protection.

Father called a social worker and informed her that he had custody of O.B. He did not want O.B. returned to Mother because he believed that she is not a fit parent. Father said he was taking O.B. to a hotel because "law enforcement had been called numerous times to his current living arrangement and they did not want him there anymore." The social worker could hear O.B. crying in the background. When the social worker pointed out that Father had only supervised visitation, he hung up.

The next day a DSS social worker called Father about his repeated contacts with DSS. Father's speech was manic and rambling. He attempted to explain something about his contact with law enforcement. The social worker could not understand him. Father was argumentative and would not allow the social worker to speak.

After DSS obtained the protective warrant for O.B., Father met with a social worker at a DSS office to surrender O.B. O.B. was crying and appeared only minimally comfortable in Father's care. When O.B. was held by a social worker, she calmed down, but began crying again when returned to Father. Father was unable to understand, soothe, or meet her other needs. Father was primarily focused on his phone and computer.

During the meeting, DSS called law enforcement for standby assistance due to Father's agitation and irritability. A social worker asked Father about his mental health. Father said he was working with a therapist and a psychiatrist and taking medication. The social worker observed that Father "presented as emotionally dysregulated throughout the contact" with DSS. Father insisted that he had full custody of O.B., even though he had only supervised visitation. DSS took custody of O.B. and placed her in foster care.

After the meeting, DSS sent Father an email stating that any further contact with DSS must be by email. During that day and night, Father sent almost 50 emails and messages to DSS and the social worker's phone, the last one sent after 2:00 a.m.

*Procedure*

DSS filed a petition pursuant to section 300, subdivision (b)(1), alleging O.B.'s parents' failure to supervise or protect her and to provide her with adequate food, shelter, clothing, or medical treatment.

At the conclusion of the initial hearing the juvenile court found that O.B. is a person described in section 300, subdivision (b)(1). The court expressed particular concern that at 13 months old O.B.'s weight was consistent with that of a four- or five-month-old child, and a DSS physician's concern that O.B. exhibited a "potential for failure to thrive."

At the detention hearing both Mother and Father submitted on the issue of detention, and the juvenile court stated that it would be treating Father as an alleged father until it received more information on paternity.

*TRO*

Also during the detention hearing, the juvenile court announced that it had taken jurisdiction over Mother's application for a TRO against Father from the family law court. The evidence before the juvenile court included that Father had violated the previous restraining order by sending an excessive number of texts and emails to Mother; that Father had failed to fill out the required form certifying that any weapons he might possess had been turned in; and that Father previously had a restraining order prohibiting contact with a different woman. The juvenile court granted Mother the TRO.

*Jurisdiction Report*

At the time of the jurisdiction report O.B. was still in foster care. Father's behavior had improved in his interactions with DSS and he signed a release of information form (ROI) so that DSS could communicate with his therapist.

The therapist reported to DSS that he was treating Father for "Adjustment Disorder and Mixed Mood." He had been working with Father for six to eight weeks, focusing on Father's anxiety and how to manage it by thinking before acting. The therapist acknowledged that Father's excessive communications caused concern regarding his stability.

Father volunteered to DSS that he had been going to Alcoholics Anonymous for several months. Drug and alcohol testing showed Father was positive for amphetamine and THC, but the results were consistent with prescription medications he was taking. Mother reported that Father used cocaine and ketamine.

DSS concluded that juvenile court oversite was necessary to ensure O.B.'s physical and emotional safety. At the time DSS became involved, only one month prior, Mother and Father's relationship posed a threat to O.B.'s safety.

*Disposition Report*

DSS obtained information on Father's criminal history. In 2006 Father was convicted of second-degree robbery and served 11 years of a 13-year sentence.

Mother reported that during her brief relationship with Father he was emotionally abusive. He used drugs including cocaine and ketamine. Mother raised concerns about Father's emotional stability, mental health, and the effect on O.B. should Father get custody.

A DSS social worker spoke with Father's treating psychiatrist. The psychiatrist stated that Father suffers from severe attention deficit hyperactivity disorder (ADHD) and anxiety. He prescribed medications and recommended that they be taken on a regular basis, particularly before meeting with DSS, but Father did not do so. The psychiatrist acknowledged that Father's behaviors in interacting with DSS has been self-sabotaging.

A DSS social worker attempted to complete a social study/family assessment with Father. Father was uncooperative and made disparaging comments throughout the interview. When the social worker informed Father that the recommendation would be that O.B. remain in foster care, Father stated he would not work with the social worker anymore and hung up. Thereafter Father sent the social worker 20 emails expressing his frustration with the dependency. Father also revoked his ROI.

DSS recommended that O.B. be declared a dependent of the juvenile court and remain in foster care; that reunification services be provided to Mother; and that reunification services be provided to Father if he is found to be a presumed or biological father.

*Combined Jurisdiction and Disposition Hearing*

On November 21, 2022, the juvenile court held a combined jurisdiction and disposition hearing. Mother submitted the matter, but Father contested.

A DSS social worker testified that Father's conduct showed an inability to follow the guidance of his service providers. DSS could no longer evaluate the services and treatment Father was getting because he revoked his ROI. Father lacks understanding

7

of the circumstances that brought O.B. into the dependency proceedings. He blames DSS for getting involved. The social worker further testified that Father's psychiatrist recommended that he take medication prior to a DSS meeting, but Father refused to do so. Father is required to take medication four times a day, but he admitted that he does not like taking pills.

DSS recommended that Father not be given custody of O.B. Father's inability to control his emotions and impulses would put O.B. at substantial risk if Father were given custody.

During the hearing the juvenile court noticed Father was talking into a recording device. The court asked Father if that was what he was doing. Father denied it. The court told Father that his emotionally dysregulated behavior has increased in every hearing that Father has participated in. Father's behavior increased the court's concern for his ability to provide calm and effective care for O.B.

*Ruling*

At the end of the combined jurisdiction and disposition hearing the juvenile court took jurisdiction, finding that the allegations of the petition were true.

The juvenile court stated that its primary concern was with Mother— her emotional stability and her ability to set boundaries. The court also expressed grave concern about O.B.'s nutritional health, noting the improvement that O.B. has shown since being placed in foster care.

The juvenile court was also concerned, to a lesser extent, with Father's behavior. Father is unable to regulate his emotions. Given O.B.'s young age at the time of the hearing (18 months old) and Father's dysregulated behavior, the court found that Father should not be given custody of O.B.

Mother's and O.B.'s counsel objected to Father being declared a presumed father. The paternity test results had not yet been obtained. The juvenile court set a special hearing in three months to determine paternity. The court declined to declare Father the presumed father. Nevertheless, the court ordered that Father be provided with services.

When the paternity test results became available, the juvenile court declared Father to be the presumed father. The court granted Father unsupervised daytime visits with O.B., but refused his request to grant him custody.

DISCUSSION

I.

*Substantial Evidence as to Jurisdiction*

Father contends that the juvenile court's jurisdictional findings are not supported by substantial evidence as to him.

Father acknowledges that dependency jurisdiction attaches to the child if either parent's actions bring the child within the statutory definition of a dependent. (*In re Alysha S.* (1996) 51 Cal.App.4th 393, 397.) Here Mother did not contest jurisdiction.

Father requests, however, that we exercise our discretion to consider the merits of his claim. We may exercise our discretion where the jurisdictional findings: 1) serve as a basis for dispositional orders that are also challenged on appeal; 2) could be prejudicial to appellant in current or future dependency proceedings; or 3) could have other consequences beyond jurisdiction. (*In re Drake M.* (2012) 211 Cal.App.4th 754, 762.) Assuming that at least one of the factors applies, we will discuss the merits of Father's challenge.

Section 300, subdivision (b)(1), provides: A child comes within the jurisdiction of the juvenile court when the child has

suffered or there is a substantial risk the child will suffer serious physical harm or illness as a result of the failure of the child's parent to adequately supervise or protect the child; the failure of the parent to provide the child with adequate food, clothing, shelter or medical treatment; or the inability of the parent to provide regular care for the child due to the parent's mental illness, developmental disability or substance abuse.

DSS has the burden of proving by a preponderance of the evidence that the child comes within the jurisdiction of the juvenile court. (*In re Isabella F.* (2014) 226 Cal.App.4th 128, 137.) We review the court's findings for substantial evidence. (*Ibid.* at p. 137.)

Jurisdiction may be based on a prior incident of harm or a future risk of harm. (*In re J.K.* (2009) 174 Cal.App.4th 1426, 1435, fn. 5.) The juvenile court need not wait until the child is seriously abused or injured to assume jurisdiction. (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

Here at 13 months old O.B.'s weight was consistent with a four- or five-month-old child and a physician expressed concern that O.B. had a "potential for failure to thrive." O.B.'s health was obviously at risk. Although Father did not have custody of O.B., he had visitation. Yet he did nothing to protect O.B. In fact, after a social worker observed Father's interactions with O.B., the social worker reported that Father was unable to understand or meet O.B.'s needs. Father lacks understanding as to why O.B. is in the dependency proceedings. He blames DSS for getting involved.

Father suffers from significant mental illness that impairs his ability to meet O.B.'s needs. His psychiatrist reported that Father suffers from anxiety and severe ADHD. DSS observed

10

that he is unable to control his emotions and impulses. Father does not follow his psychiatrist's instructions on taking medication and stated that he does not like taking pills. The juvenile court directly observed Father's dysregulated behavior.

Finally, Father's relationship with Mother places O.B.'s emotional well being at risk. Father violated the first restraining order by contacting Mother numerous times. Mother presented evidence of numerous texts and emails from Father. Mother had to get a second restraining order. Mother reported that during her brief relationship with Father he was emotionally abusive. She raised concerns about Father's emotional stability and mental health. Those concerns were confirmed by DSS and the juvenile court's own observations.

There is more than ample evidence to support the juvenile court's finding of jurisdiction.

## II.

### *Sufficient Evidence to Support Juvenile Court's Order*

Father contends that the juvenile court's order removing O.B. from his custody is not supported by sufficient evidence.

Section 361, subdivision (c)(1), provides, in part: "A dependent child shall not be taken from the physical custody of his or her parents . . . with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence of any of the following circumstances listed in paragraphs (1) to (5), inclusive . . . [¶] (1) There is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody."

11

"The term 'resides' . . . mean[s] ""to dwell permanently or for a considerable time.""" (*In re Dakota J.* (2015) 242 Cal.App.4th 619, 628.)  Section 361, subdivision (c)(1), does not apply because O.B. was not residing with Father.  Mother had sole legal custody of O.B.  O.B. resided with Mother since her birth.  Father had custody of O.B. for a short period only because he lied about having joint custody.

Section 361.2, subdivision (a), provides, in part:  "If a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child.  If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child."

The finding of a detriment necessary to deprive Father of custody under section 361.2, subdivision (a), requires proof by clear and convincing evidence.  (*In re Marquis D.* (1995) 38 Cal.App.4th 1813, 1829.)  The party opposing placement with Father has the burden of proof.  (*In re C.M.* (2014) 232 Cal.App.4th 1394, 1402.)

The clear and convincing evidence standard requires the party with the burden of proof to convince the trier of fact that it is "highly probable" the facts which he asserts are true. (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 998.)  We review the record in a light most favorable to the prevailing party giving "deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and

12

drawn reasonable inferences from the evidence." (*Id.* at pp. 1011-1012.)  We uphold the finding if any reasonable finder of fact could have found it highly probable the fact was true.  (*Id.* at p. 1011.)

Here, although the juvenile court did not make an express finding of detriment, no reasonable trier of fact could conclude otherwise.  At the time of the hearing Father had unresolved mental illness that made it impossible for him to care for O.B.  In addition, he had unresolved conflicts with Mother.  Father also refused to cooperate with DSS.  A DSS social worker could not complete a social study/family assessment because Father would not cooperate.  Thereafter Father sent DSS 20 emails expressing his frustration.  Father revoked his ROI, making it impossible for DSS to keep track of his progress with his service providers.  Father also did not understand why DSS is involved.  There is simply no doubt it would have been detrimental to O.B. to give Father custody.

DISPOSITION

The judgment (order) is affirmed.

<u>NOT TO BE PUBLISHED.</u>

GILBERT, P. J.

We concur:

BALTODANO, J.        CODY, J.

13

Linda D. Hurst, Judge

Superior Court County of San Luis Obispo

_____

Jesse Rodriguez, under appointment by the Court of Appeal, for Defendant and Appellant.

Rita L. Neal, County Counsel, Ann Duggan, Deputy County Counsel, for Plaintiff and Respondent.