Filed 4/14/26  In re J.H. CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| In re J.H., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> X.H., <br><br> Defendant and Appellant. | G066055, G066126 <br><br> (Super. Ct. No. 25DP0686) <br><br> O P I N I O N |

Appeal from orders of the Superior Court of Orange County, June Jee An, Judge. Affirmed.

Lauren K. Johnson, under appointment by the Court of Appeal, for Defendant and Appellant.

Leon J. Page, County Counsel, Debbie Torrez and Chloe R. Maksoudian, Deputy County Counsel, for Plaintiff and Respondent.

No appearance by the Minor.

In this consolidated appeal, X.H. (Father) contends there is insufficient evidence to support the juvenile court's orders removing his 15-year-old daughter J.H. from his custody and placing her in the custody of her mother, X.He. (Mother). We disagree and affirm the challenged orders.

FACTUAL AND PROCEDURAL BACKGROUND

This case arose under tragic circumstances in June 2025, after J.H. discovered her older brother (Brother) had hanged himself in their family home in Irvine. At the time of his death, Brother was attending college in San Diego. But he was under tremendous pressure from his Mandarin speaking parents to come home on the weekends to make sure Mother was taking her medications and to help Father with his business affairs. Although Father spent about 10 months of the year in China, he relied on Brother to translate for him whenever he was in town.

Following Brother's death, J.H. was detained pursuant to a protective warrant and placed with a friend's family in Irvine. Mother was temporally hospitalized under Welfare and Institutions Code section 5150 for suicidal ideation.[1] It was the sixth time in the previous 10 weeks Mother had been involuntarily hospitalized.

On June 16, 2025, the Orange County Social Services Agency (SSA) filed a child welfare petition alleging J.H. was suffering general neglect and emotional abuse at the hands of her parents. (§§ 300, subds. (b), (c).) When interviewed by the social worker, J.H. initially said she did not feel safe living with Mother because Mother can be short tempered, volatile, and insulting if she does not take her medications. However, J.H. made clear she

---

[1] All further statutory references are to the Welfare and Institutions Code.

loves her mother and wanted to be returned to her care eventually. Despite Mother's mental health issues and sometimes erratic behavior, J.H. said she would feel safe living with Mother so long as she took her medications.

In contrast, J.H. reported she does not feel connected to Father and does not want to live with him. That is because Father was never around the home that much, and when he did stay with the family, he argued with Mother and blamed others for his problems. He also faulted Mother and J.H. for not doing more to prevent Brother's suicide. J.H. denied Father physically abused her in any way, but she did claim she was physically abused by one of Father's friends while she was taking golfing lessons from him in China. J.H. believed her parents knew about the abuse, but they did nothing about it. J.H. was so distraught over the situation that she overdosed on pills prescribed for her mother.

Father told the social worker he never saw his golf-coach friend physically abuse J.H. Father also felt that J.H. was possibly overreacting to the situation because she was unaccustomed to the strict coaching methods used in China. Father said he planned to return to China after Brother's funeral, but if J.H. wanted him to stay in the United States, he would. He also said he would be generally supportive of J.H. in terms of where she wanted to live. However, he did not think Mother was a suitable caregiver because she is mentally unstable and prone to hallucinations, erratic behavior, and memory lapses.

When interviewed by the social worker, Mother denied having any mental health problems and said her behavior issues were attributable to hormonal imbalances caused by a noncancerous pituitary tumor. She also said she loves J.H. and would like her returned to her care.

At the June 17, 2025 detention hearing, the juvenile court ordered J.H. to remain in her current placement, with supervised visitation for her parents. The case plan called for therapy for J.H. and her parents, as well as parenting classes for Mother and Father. The family was assessed for the Conditional Release to Intensive Supervision Program (CRISP) but was found unsuitable for that program.

In July 2025, the social worker reported J.H. was reluctant to participate in services, and although J.H.'s visits with Mother were going well, she refused to visit Father. During this period, Mother was hospitalized for a lacerated lip, which she said was caused when Father threw a phone at her. Father denied the allegation, however, claiming the injury resulted from an accident.

In August 2025, J.H.'s caregivers reported they were having some disciplinary problems with J.H. and gave notice they could no longer afford to care for her. They also expressed concern about whether Mother was capable of caring for J.H. Father shared this concern. He said Mother had broken and thrown things in the past when she had gotten angry, which J.H. confirmed. Father admitted, though, he has never seen Mother act violently toward J.H.

Father also told the social worker he was presently living with his sister (Aunt) in San Diego. He said he had not seen J.H. since Brother's funeral and he was planning to divorce Mother.

J.H. told the social worker that, although Mother can be draining at times, she would feel safe living with her and wanted to do so. However, because Mother had not yet started receiving mental health services, the social worker felt it was premature to return J.H. to her care at that time.

In August 2025, Mother was briefly hospitalized due to hypopituitarism, which put her in an altered mental state. Father reported

4

he phoned Mother while she was in the hospital, and she told him J.H. had been bitten by a big rat, which was not true. This added to Father's concern about J.H.; he feared she would suffer the same tragic fate as her brother if she were returned to Mother's care.

At the jurisdiction hearing in early September 2025, the juvenile court sustained the allegations that J.H. was at risk of serious emotional harm due to her parents' failure to protect her. (§ 300, subds. (b)(1), (c).) The court scheduled the disposition hearing for September 12.

In the meantime, on September 8, Mother notified the social worker she had hired a live-in nanny to assist her with her needs. That same day, J.H. was removed from her friend's house and placed at a children's home. When interviewed, J.H. told the social worker she wanted to live with her mother. Father had volunteered to move out of Aunt's house in San Diego so that J.H. could live with Aunt, but J.H. said she preferred to live with her mother. J.H. also said she had no interest in speaking to her father.

On September 12, 2025, the case was called for the scheduled disposition hearing. In light of Mother's decision to hire a live-in nanny, and consistent with J.H.'s wishes, Mother's attorney asked the court to release J.H. from the children's home and allow her to live with Mother. SSA objected to that request, as did the attorneys for Father and J.H. Although they commended Mother for hiring a live-in nanny to assist with her needs, they argued it was still too soon to place J.H. in her care.

The juvenile court disagreed. While recognizing the family had previously been deemed unsuitable for the CRISP program, the court ordered J.H. to be released to Mother under about a dozen "CRISP-like" conditions. Among other things, Mother was required to: (1) follow her medication protocol; (2) not pressure J.H. to participate in her medical care management;

(3) not be alone with J.H. for more than eight hours at a time; (4) provide at least 72 hours' advance notice if there are any changes with the live-in nanny; and (5) comply with all announced and unannounced visits by SSA.

In setting these conditions, the juvenile court warned Mother that J.H. would be removed from her care if she did not fully comply with all of them. The court also made clear its ruling was intended to give Mother a trial run to demonstrate her ability to care for J.H. With that in mind, the court continued the disposition hearing for 30 days, to October 9, 2025. Rather than await the outcome of the trial run, Father appealed the court's decision (appellate case No. G066055).

On October 7, the social worker reported Mother was in full compliance with all the conditions ordered by the court. In particular, the social worker reported Mother "has made her prescribed medication available to [SSA] to ensure [she] is taking her medication as" required. The "live-in nanny confirmed she watches [Mother] take her medications daily as prescribed to ensure [Mother] is taking all medications." And Mother "has adhered to all medication management and has followed up with [her] prescribing physician."

During the 30-day trial run, Mother was also fully cooperative with SSA's visits to her home, and J.H. was observed to be receiving appropriate care. There were no signs J.H. was being abused or neglected in any fashion. Mother reported J.H. is active in golf, completes all her homework, is well behaved, and appears happy. This assessment was echoed by J.H.'s social workers, who described J.H. as a smart, respectful, and caring person who is actively involved in sports and has healthy social relationships.

During one of the visits during the trial run period, Mother had to be reminded of what services had been recommended to her as part of her

case plan. But during a subsequent visit, Mother said she had made appointments to see a therapist, a neurologist, and an endocrinologist, and she was trying to sign up for parenting classes. She also showed the social worker her pill planner and alerts for taking her medication. And the nanny reported she had no concerns about the family.

For his part, Father reported completing an online parenting education program, but when the social worker asked him what he had learned from the program, he seemed unsure, and the social worker was unable to confirm he had completed it. Father's relationship with J.H. also continued to be strained. Asked to rate how safe she would feel living with Father, with zero being not safe and ten being very safe, J.H. said two. In comparison, she answered ten when asked the same question about her mother. J.H. told the social worker she was glad to be living with her mother again and was getting along well with the nanny.

During the 30-day trial run, the social worker also spoke to J.H.'s uncle, who was visiting Mother and J.H. from out of town. He said Mother was part of an online chat group that included himself, the nanny, and various members of Mother's extended family. The group was established to ensure Mother was taking her medications as prescribed. He said Mother videos herself when she takes her pills and then posts the video to the group for verification.

At the disposition hearing on October 9, 2025, Father reiterated his concerns about Mother's ability to safely care for J.H. He stated that when he was living with the family, Mother would claim to be taking all her medications, but he often found out that was not the case. He also testified that Mother has gone through many nannies in the past, and none of them were able to ensure she takes her medications. Thus, he is doubtful Mother's

7

current live-in nanny will be able to do so. Father felt that was the key to Mother's ability to care for J.H. If there was some way to ensure Mother took her medication, J.H. would be safe in her care. However, Father did not think that was possible. He believed "there's nothing we can do to alleviate the dangerous situation [J.H.] is in" by virtue of her living with Mother.

Asked if there was anyone other than Mother that he would like to see J.H. living with, Father answered, "I can't think of anybody at this very moment, because I don't spend a lot of time in the United States." But he said he would rather have J.H. live in foster care than with her mother. Asked if he would like J.H. to be placed with him, he replied, "Well, I don't recommend that because I don't believe [J.H.] would choose me. . . . I'm here testifying, but it is not because I want to have custody of [J.H.]; it's because I'm concerned about [her] safety."

Aunt also testified at the disposition hearing. She stated she lived with Mother, J.H., and Brother for about six weeks in the spring of 2025. During that time, Mother claimed she was taking her medications but often forgot to do so. She also had a hard time remembering things, threw things at the children when she got angry, and sometimes tried to leave the house at night. This made the children fearful of Mother and worried about her safety. They told Aunt they did not want her to leave them alone with Mother when it was time for Aunt to return to her own house.

Considering all that, Aunt was surprised to learn J.H. wanted to live with Mother now. Aunt felt it would be dangerous for J.H. to do so, and J.H. did not understand the risks of living with her mother. Aunt was doubtful Mother was capable of taking her medications as prescribed or that the nanny could ensure she was compliant with her medications. And even if

8

Mother did take her medications, Aunt felt she would still pose a danger to J.H. because of her erratic behavior.

Despite the concerns about Mother's mental health, counsel for SSA argued Mother had proven she was a responsible caretaker by following her medication protocol and safely providing for J.H. during the past month. He urged the juvenile court to vest custody of J.H. with Mother under a family maintenance plan and to convert the CRISP-like conditions into a protective order for J.H.'s safety. The attorneys for Mother and J.H. joined that request.

Father's attorney asked the juvenile court to order family reunification services for both him and Mother. He felt it was too soon to grant Mother custody of J.H., given her history of mental illness, and there was no way to ensure she would remain compliant with her medication protocol.

However, the juvenile court ordered custody of J.H. removed from Father and vested in Mother, with maintenance services for Mother and enhancement services for Father. In so doing, the court issued a protective order that largely mirrored the CRISP-like conditions it had imposed during J.H.'s previous release to Mother. Father timely appealed the court's order (appellate case No. G066126).[2]

## DISCUSSION

Father challenges the sufficiency of the evidence to support the juvenile court's orders removing J.H. from his custody and placing her in the

---

[2] Father's two appeals were consolidated by a prior order of this court.

custody of Mother. As we explain below, the record contains ample evidence to support the court's orders.

I.

THE ORDER REMOVING J.H. FROM FATHER'S CUSTODY

*A. Applicable Law and Standard of Review*

Although one of the primary goals of the child welfare system is to preserve the family unit whenever possible (*In re Dakota J.* (2015) 242 Cal.App.4th 619, 628–629), section 361, subdivision (c) authorizes the juvenile court to remove a dependent child from the physical custody of a parent with whom the child resided at the time the dependency petition was filed if there is clear and convincing evidence of two circumstances. First, "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the [child] if the [child] were returned home." (§ 361, subd. (c)(1).) And second, "there are no reasonable means by which the [child's] physical health can be protected without" removal. (*Ibid.*)

To support a removal order, "'"'The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child.' [Citation.] The court may consider a parent's past conduct as well as present circumstances."'"' (*In re Lana S.* (2012) 207 Cal.App.4th 94, 105.)

"We review a dispositional order removing a child from a parent for substantial evidence, "'keeping in mind that the trial court was required to make its order based on the higher standard of clear and convincing evidence."'" (*In re M.V.* (2022) 78 Cal.App.5th 944, 960.) The central question is "'whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was

true.'" (*Ibid*.) In making that determination, "[w]e view the record in the light most favorable to the prevailing party and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Ibid*.)

*B. Analysis*

As a preliminary matter, SSA notes Father did not object to the juvenile court's order removing J.H. from his custody. In fact, it was evident from Father's testimony at the disposition hearing that he did not want J.H. to be placed in his care. Given these circumstances, SSA contends the doctrines of estoppel and forfeiture preclude Father from challenging the removal order on appeal. (See *In re Lorenzo C.* (1997) 54 Cal.App.4th 1330, 1338 [a party who fails to raise an issue in the trial court is generally deemed to have forfeited the issue for purposes of appeal].) However, "a claim that the evidence is insufficient to support a disposition order in a dependency matter generally is not forfeited even if not raised below." (*In re J.N.* (2021) 62 Cal.App.5th 767, 777, fn. 5; accord, *In re R.V.* (2012) 208 Cal.App.4th 837, 848; *In re Javier G.* (2006) 137 Cal.App.4th 453, 464.) We therefore proceed to the merits.

The record is clear that Father and J.H. do not have a healthy relationship. While J.H. was growing up, Father spent most of his time abroad, away from the family. And when he was at home, he often instigated arguments with Mother and blamed others for his problems. He even went so far as to blame J.H. for her brother's suicide. Thus, it is hardly surprising J.H. does not feel connected to Father, would not feel safe living with him, and does not want to do so. Although a dependent child's preferences are not determinative of their best interests, they are "powerful demonstrative evidence" of such, especially when it comes to older children like J.H., who

11

will be turning 16 in just a few months. (*In re Aljamie D.* (2000) 84 Cal.App.4th 424, 432; *In re Michael D.* (1996) 51 Cal.App.4th 1074, 1087.)

Viewing the record in favor of the juvenile court's ruling, there is substantial evidence to support its finding that removing J.H. from the custody of her father was necessary to prevent a substantial danger to her emotional wellbeing.

The record also contains substantial evidence to support the second requirement for removal, in that there were no reasonable means to protect J.H. other than removing her from Father's custody. Father contends he could attend therapy with J.H. or get a nanny at his home to help smooth things out with his daughter and ensure she was properly cared for in his home. But Father did not make any effort to do these things before the court issued its removal order, and there was no evidence J.H. was ready to engage in therapy with her father. Moreover, Father's own testimony made clear he did not believe it was a good idea for J.H. to live with him, given how much he travels and how she feels about him. On this record, there is no basis to disturb the juvenile court's order removing J.H. from Father's custody.

## II.

### THE ORDER PLACING J.H. IN MOTHER'S CUSTODY

Father also contends there is insufficient evidence to support the juvenile court's decision to return J.H. to the custody of Mother. Again, we disagree.

As explained above, removal of a child from a parent with whom the child was living when the underlying dependency petition was filed is permitted only when there is a substantial danger to the child's health or wellbeing if the child were returned home and there are no reasonable means available other than removal to protect the child. (§ 361, subd. (c)(1).)

12

Although Mother's mental health issues posed a substantial danger to J.H.'s wellbeing when this case first arose, the record supports the juvenile court's decision that is no longer the case.

The turning point came in September 2025, when Mother hired a live-in nanny to assist with her medication protocol and the juvenile court placed J.H. in Mother's care. Since then, there have been no reports that J.H. has been neglected or abused or that her wellbeing has been jeopardized or compromised in any fashion. Father appealed the juvenile court's decision to return J.H. to Mother under an array of CRISP-like conditions, but he has not raised any specific arguments regarding that decision, and it is clear the one-month trial run the court authorized was a success. During that period, the nanny watched Mother ingest her medications to ensure she was taking them as prescribed, and Mother's family members created an online chat group to stay on top of that issue, as well. Mother was also compliant with all the announced and unannounced visits the social workers made to her house. This demonstrates the one concern Father had about returning J.H. to Mother's care—Mother's ability to comply with her medication protocol—has been adequately addressed.

Of course, there is no guarantee Mother will continue to comply, which is why the trial court issued a protective order in conjunction with its decision to vest custody of J.H. with Mother. Like the CRISP-like conditions that came before it, the stringent protective order requires Mother to, inter alia, adhere to her medication management, and it also calls for continued unannounced social worker visits to her home. Such measures have been recognized as an effective alternative to the removal of a dependent child who is at risk of potential harm from a parent. (*In re Hailey T.* (2012) 212 Cal.App.4th 139, 148; *In re Henry V.* (2004) 119 Cal.App.4th 522, 529.)

Furthermore, as an active teenager who attends high school and participates in sports, J.H. has regular contact with teachers and other mandated reporters, who are in a good position to assess her condition. (See *In re Hailey T., supra*, 212 Cal.App.4th at p. 147 [error to remove dependent child from her parent's custody given that the child had good language skills and attended school regularly].) In light of all these considerations, we conclude there is substantial evidence to support the juvenile court's decision to return J.H. to her mother's care and vest custody of her with Mother.

## DISPOSITION

The juvenile court's orders are affirmed.


GOODING, J.

WE CONCUR:


MOORE, ACTING P. J.


SCOTT, J.